2:26-cv-02999-LK

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

BOXUN HU,
Plaintiff,

v.

325HTD GROWERS, LLC, a Michigan Limited Liability Company, d/b/a Amber Waves Cannabis Co., DAVID SIKKEMA, individually and as Chief Executive Officer and Chief Marketing Officer; PAUL GRAVES, individually and as Chief Financial Officer, IRS Partnership Representative, and, as alleged in the alternative herein, either a licensed Certified Public Accountant or a person who falsely held himself out as a Certified Public Accountant; ANITA SIKKEMA, individually as member/shareholder; JOHANNES SIKKEMA, individually and as member/shareholder; JAMES SIKKEMA, individually and as member/shareholder; STEVEN SIKKEMA, individually and as member/shareholder; MATILDA RAKAJ, individually and as member/shareholder; FERDI RAKAJ, individually and as member/shareholder; VASJA TRESKA, individually and as member/shareholder; RAY OATMAN, individually and as member/shareholder, and LARRY SANT, individually and as member/shareholder,

Defendants.

Civil Action No. ____________________

# COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

## JURY TRIAL DEMANDED

## PRELIMINARY STATEMENT

1. Boxun Hu came to the United States from the People's Republic of China and invested nearly his life savings in an American business. He did everything right. He signed a lawful contract. He contributed his capital. He waited patiently. He broke no law. He was never arrested. He was never charged. He was never accused of wrongdoing of any kind. Yet, in May of 2023, Chief Executive Officer David Sikkema and Chief Financial Officer Paul Graves -- the two men who essentially controlled 325HTD Growers, LLC -- convinced him to enter into a contract in which his rights were illusory. They told him his co-investor's legal troubles required it. They told him it was urgent. They gave him hours to sign it. They deceived him.

2. Boxun Hu was not a lawyer. He was an investor who had trusted the Chief Executive Officer and the Chief Financial Officer of the Company he had joined. Graves represented to Hu that he was a Certified Public Accountant, both in connection with a financial projection document Graves prepared before Hu's initial investment and again in May 2023, and Hu had every reason to rely on that professional credential. What Hu did not know, and what Sikkema and Graves knew, was that Michigan marihuana licensing law imposed no such requirement. No law, no regulation, and no provision of the operating agreement required Hu to exit. His co-investor's charge was not Hu's legal problem. It was used as an excuse to deceive Hu.

3. The result of the deception was that Hu signed an Amended and Restated Operating Agreement that set his ownership interest at zero. The equity he surrendered flowed directly to the Sikkema family, the white controlling majority, who had structured this enterprise from the beginning. Hu and his co-investor Fei Xie were the only two Chinese members among an otherwise all-white membership. They were the only two members ever asked to exit. They were the only two members whose shares were set to zero. Hu and Xie were the only two members whose savings were absorbed into the pockets of the men who falsely told them the law required it.

4. Three years later, Hu and Xie sent Defendant David Sikkema a letter demanding the return of the initial investment. Sikkema responded on Amber Waves letterhead and signed by him over the Company signature block (d/b/a Amber Waves). Sikkema's letter promised nothing. Its answers were hidden in a riddle-like response. It was written by a man who knew that Hu's shares were zero and who knew that zero multiplied by any number of profits was still zero, and who dressed that mathematical certainty in the language of optimism and encouragement. Hu and his co-investor Xie wrote again. Sikkema did not

respond.

5. This action seeks to hold Defendants accountable for the theft of Boxun Hu's investment, the destruction of his membership rights, the racial discrimination that motivated the scheme, and the deliberate and cynical use of a legal entity to shield individual wrongdoing from consequence.

6. As used throughout this Complaint, "punitive damages" means punitive damages and exemplary damages.

**PARTIES**

7. Boxun Hu is a citizen of the People's Republic of China domiciled in the State of Washington, with a home address of 7421 NE 122nd Street, Kirkland, Washington 98034. At the time of the events giving rise to this action, Plaintiff was residing in Mainland China. Plaintiff invested $357,935.25 of his personal savings into 325HTD Growers, LLC, representing half of a total combined investment of $715,870.50 made jointly with co-investor Fei Xie.

8. Schedule A to the Second Agreement lists Plaintiff's address as an apartment in Long Island City, New York, and lists co-investor Fei Xie's address as an apartment in New York City, New York. That address information was carried forward, without update, from the Original Agreement executed on November 9, 2020, and does not reflect Plaintiff's or Xie's residence at any time thereafter. By the time the Second Agreement was executed on May 16, 2023, Plaintiff and Xie had already relocated to and established domicile in the State of Washington, and Plaintiff has remained domiciled in Washington continuously since that time, including as of the filing of this Complaint.

9. Defendant 325HTD Growers, LLC is a Michigan Limited Liability Company. Its registered agent and place of formation is in the State of Michigan at all relevant times. The Company has conducted its operations principally in Michigan.

10. Defendant David Sikkema is an individual residing at 3841 Haynes Street, Jordan Station, Ontario, Canada L0R 1S0. He is sued individually and in his capacity as Chief Executive Officer and Chief Marketing Officer of 325HTD Growers, LLC. David Sikkema was the dominant and controlling force within the LLC and was assisted by Chief Financial Officer Paul Graves. Sikkema and Graves were the primary authors of the false representations made to Plaintiff in May 2023. Sikkema was the signatory on the May 20, 2026 letter that responded to Plaintiff's demand for return of his investment with deliberate evasion. He is the central wrongdoer in this action and bears primary responsibility for the damages suffered by Plaintiff.

11. Paul Graves is an individual residing at 53304 Hidden River Road Drive, South Lyon, Michigan 48178. He is sued individually and in his capacity as Chief Financial Officer and IRS Partnership Representative under the Internal Revenue Service and, as alleged in the alternative in paragraphs 12 through 14 below, either as a licensed Certified Public Accountant or as a person who falsely held himself out to Plaintiff as a Certified Public Accountant. Defendant Paul Graves held himself out as a financial professional of the highest standing. Plaintiff's reliance on Graves's professional standing was reasonable and was exploited by Graves repeatedly. His culpability is second only to that of Defendant David Sikkema, and in some respects exceeds it, because his claimed professional credentials gave the fraud a legitimacy it did not deserve and could not have achieved without him.

12. Prior to the filing of this Complaint, an inquiry was conducted using the National Association of State Boards of Accountancy's CPAverify database (app.cpaverify.org) and the Michigan Department of Licensing and Regulatory Affairs ("LARA") online license verification system. That inquiry did not locate any record of Paul Graves holding, or ever having held, a license to practice as a Certified Public Accountant in the State of Michigan or in any other jurisdiction searchable through CPAverify. Plaintiff therefore asserts the following two theories in the alternative pursuant to Fed. R. Civ. P. 8(d)(2) and (3).

13. First Alternative Theory: Graves Falsely Held Himself Out as a Certified Public Accountant. Plaintiff alleges that Defendant Paul Graves has never held a license to practice as a Certified Public Accountant in any jurisdiction, and that his representations to Plaintiff that he was a Certified Public Accountant -- including in connection with the financial projection document described in paragraphs 29 and 30 below, and in connection with the May 16, 2023 representations described in paragraphs 35 through 41 below -- were knowingly false and were made with the intent to induce Plaintiff's reliance. Graves's false claim to be a Certified Public Accountant was a material misrepresentation and was the primary reason Plaintiff invested his savings in the Company, both because it lent false professional credibility to the financial projections Graves prepared and presented to Plaintiff before Plaintiff's initial investment, and because it caused Plaintiff to trust Graves's later representations regarding the purported necessity of Plaintiff's exit from the Original Agreement. Graves's unauthorized use of the title "certified public accountant" violates MCL 339.723(1), which prohibits use of that title or the abbreviation "CPA" by any person not approved to do so by the state board of accountancy, and MCL 339.723(2), which prohibits a person from engaging in the practice of public accounting without holding a Michigan CPA license, and MCL 339.601(1), which prohibits a person from using a title designated under the occupational code without a license issued by the department. Graves is subject to an administrative fine of not more than $25,000.00 per violation under MCL 339.723(5), and to misdemeanor penalties, including a fine of not more than $500.00 or imprisonment for not more than 90 days, or both, under MCL 339.601(4). Graves's use of a false professional credential to

obtain Plaintiff's investment, and later to obtain Plaintiff's surrender of his membership interest, independently constitutes false pretenses under MCL 750.218(1)(c) and the definition of "false pretense" set forth in MCL 750.218(11).

14. Second Alternative Theory: Graves Is a Licensed Certified Public Accountant. In the event discovery establishes that Defendant Paul Graves holds or held, at the relevant times, a valid license to practice as a Certified Public Accountant in some jurisdiction not reflected in the pre-filing inquiry described in paragraph 12 above, Plaintiff alleges, in the alternative and without waiver of the theory set forth in paragraph 13 above, that Graves is liable in his capacity as a licensed professional for the fraudulent and unethical conduct alleged throughout this Complaint, including for conduct tending to discredit the accounting profession in violation of MCL 339.734(1)(h), and that his conduct as a licensed professional who exploited that license to defraud a minority investor warrants punitive damages commensurate with the heightened duty of care and public trust attendant to that license.

15. Defendant Johannes Sikkema is an individual residing at 585 La Brant Road, Kalispell, Montana 59901. He is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements and whose membership interest benefited from the wrongful absorption of Plaintiff's shares.

16. Defendant Anita Sikkema is an individual residing at 9201 W. 225 N., Etna Green, Indiana. She is the wife of Defendant David Sikkema and is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements and whose membership interest benefited from the wrongful absorption of Plaintiff's shares.

17. Defendant James Sikkema is an individual residing at 12 Canada Street, Hamilton, Ontario, Canada L0S 1E6. He is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements and whose membership interest benefited from the wrongful absorption of Plaintiff's shares.

18. Defendant Steven Sikkema is an individual residing at 2127 Hollow Road, Fonthill, Ontario, Canada L0S 1E6. He is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements and whose membership interest benefited from the wrongful absorption of Plaintiff's shares.

19. Defendant Matilda Rakaj is an individual residing at 47465 Barbara Road, Macomb, Michigan 48044. She is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements.

20. Defendant Ferdi Rakaj is an individual residing at 2500 Normandy Road, Unit 43, Royal Oak, Michigan 48073. He is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements.

21. Defendant Vasja Treska is an individual residing at 33707 Bayview Drive, Chesterfield Township, Michigan 48045. He is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements.

22. Defendant Ray Oatman is an individual residing at 8226 Acker Highway, Hudson, Michigan 49247. He is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements.

23. Defendant Larry Sant is an individual residing at 7754 Hidden Ridge Lane, Northville, Michigan 48148. He is sued individually and as a member and shareholder of 325HTD Growers, LLC who signed both operating agreements.

## JURISDICTION AND VENUE

24. In the alternative, and to the extent it may apply, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of the People's Republic of China domiciled in the State of Washington. Upon information and belief, Defendants Johannes Sikkema, Anita Sikkema, Matilda Rakaj, Ferdi Rakaj, Vasja Treska, Ray Oatman, and Larry Sant are citizens of a State other than Washington, and Defendants David Sikkema, James Sikkema, and Steven Sikkema, although residing in Ontario, Canada, are United States citizens domiciled abroad. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff pleads this diversity basis in the alternative, and not as the primary basis for jurisdiction set forth in paragraph 26 below, because it depends on the citizenship status of certain Defendants, which remains subject to confirmation in discovery, and because 28 U.S.C. § 1332(a)(2) does not extend to a controversy between an alien plaintiff and an alien defendant.

25. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

26. This Court has subject matter jurisdiction over Plaintiff's federal claims, including his securities fraud and civil rights claims, pursuant to 28 U.S.C. § 1331.

27. This Court has personal jurisdiction over all Defendants under Washington's long-arm statute, RCW 4.28.185, and the Due Process Clause of the Fourteenth Amendment. Defendants entered into operating agreements with a Washington-domiciled investor. Defendants directed fraudulent communications to Washington. Defendants induced the surrender of a Washington domiciliary's contract rights. The injury

suffered by Plaintiff was felt in Washington. Under Calder v. Jones, 465 U.S. 783 (1984), Defendants' intentional tortious conduct expressly aimed at a Washington domiciliary confers personal jurisdiction in this district.

28. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Plaintiff is domiciled in this district. A substantial part of the events giving rise to this action, including the receipt of Defendant Sikkema's evasive May 20, 2026 letter at the Kirkland, Washington address shared by Plaintiff's co-investor's family, and the harm suffered by Plaintiff as a Washington domiciliary, occurred in or are connected to this district.

## FACTUAL ALLEGATIONS

29. Before Plaintiff and co-investor Fei Xie made their initial investment in the Company, Defendant Paul Graves prepared and provided to Plaintiff and Xie a financial projection document setting forth the Company's anticipated revenues, growth, and expected return on investment. Graves prepared and presented that document in his capacity as the Company's financial officer and represented, directly or through Defendant Sikkema, that he was a Certified Public Accountant.

30. Plaintiff's decision to invest $357,935.25 of his personal savings in the Company was made in substantial and specific reliance on the credibility that Graves's claimed CPA credential lent to the financial projection document described in the preceding paragraph. Graves's represented status as a Certified Public Accountant was the primary reason Plaintiff believed the projections contained in that document to be reliable, and the primary reason Plaintiff proceeded with his investment. As alleged in paragraphs 12 through 14 above, Plaintiff asserts in the alternative that this representation was either an outright falsehood, in which case the reliability Graves attached to the projections was manufactured entirely, or a claim made by an actually licensed professional who nonetheless used that license as a tool of the fraud alleged herein.

31. On or about November 9, 2020, Plaintiff Boxun Hu and co-investor Fei Xie entered into an Operating Agreement with 325HTD Growers, LLC and all Defendants under the original agreement. Plaintiff held a six-percent membership interest in the LLC. Co-investor Fei Xie likewise held a six-percent membership interest. The remaining eighty-eight percent was distributed among the Sikkema family members and other Defendants.

32. In consideration of his membership interest, Plaintiff contributed $357,935.25 to the Company, representing nearly all of his life savings. Combined with the equal contribution of co-investor Fei Xie, the total investment made by the two Chinese national members was $715,870.50, including six (6) transfers and eighteen (18) purchase invoices confirmed by Defendant Paul Graves, CFO of the Company, and also confirmed by emails, tax documents, wire transfer records, checks, credit card bills, and commercial

invoices documenting the transfers and purchases that occurred.

33. The LLC was licensed to operate a marijuana cultivation business under Michigan law. Plaintiff's role was that of a passive investor; he had no operational responsibilities within the Company. His return on investment depended entirely upon the managerial efforts of Defendants, and specifically upon the oversight of Defendant David Sikkema as CEO and CMO and Defendant Paul Graves as CFO.

34. On or about May 10, 2023, co-investor Fei Xie was charged with a federal marijuana-related offense in the Western District of Oklahoma. Plaintiff Boxun Hu was not charged and was not named in any indictment or criminal proceeding of any kind.

35. On or about May 16, 2023, six days after co-investor Xie's charge, Defendant David Sikkema and Defendant Paul Graves contacted Plaintiff through co-investor Xie and represented to him that he was required to immediately exit the Original Agreement. Defendants communicated this with urgency and told Plaintiff the matter was time-sensitive and required immediate action.

36. These representations were false in every legally material respect. Plaintiff Boxun Hu had committed no offense. He had been charged with nothing. He faced no disqualification under any provision of Michigan marijuana licensing law. MCL 333.27958 and related provisions of the Michigan Regulation and Taxation of Marihuana Act (Exhibit A) do not provide that a member in good standing must exit a licensed entity because a co-investor has been charged. No such provision exists, and no regulatory authority required it. No provision of the Original Agreement required it. The representation made to Plaintiff by Defendants Sikkema and Graves was fabricated. There was no legal basis for it whatsoever.

37. Plaintiff's situation was distinct from Xie's. Plaintiff faced no claim of wrongdoing whatsoever, yet he was told to surrender nearly all of his life savings and his membership rights because another Chinese member of the Company had been charged. This was not a legal requirement. It was a pretext -- and it is a pretext that was applied to the two Chinese members of the LLC and to no one else.

38. Plaintiff was in Mainland China at the time these representations were made, thousands of miles from the LLC's operations, from legal counsel familiar with Michigan law, and from any meaningful ability to investigate the claims made by the CEO and CFO of the company into which he had invested almost everything. He was given mere hours to find a lawyer. He could not. On May 16, 2023, operating under the false belief that he was legally required to do so, Plaintiff signed the Amended and Restated Operating Agreement ("Second Agreement"). His reliance was on CEO Sikkema and particularly on CFO Graves, whom Graves had represented to be, and whom Plaintiff believed in reliance on the financial projection document described in paragraphs 29 and 30 above and Graves's own repeated representations to be, a

licensed Certified Public Accountant under the laws of the State of Michigan -- a representation Plaintiff alleges, in the alternative as set forth in paragraphs 12 through 14 above, was either false or, if true, exploited by Graves in service of the fraud alleged herein.

39. The Second Agreement assigned Plaintiff a zero-percent membership interest. It assigned co-investor Xie a zero-percent membership interest. The equity surrendered by both men was redistributed within the LLC. The primary beneficiaries of that redistribution were Defendant David Sikkema and other Sikkema family member-shareholders.

40. The Second Agreement contained vague conditional language suggesting that, under certain unspecified conditions, a return of initial investment might occur. These conditions were never defined with any specificity. They were never formally evaluated. They were never declared to have been met or unmet through any documented process. The promise of repayment was false at the moment it was made, and Defendant Paul Graves, as CFO and, in the alternative, either as a person falsely claiming the professional competency of a licensed CPA or as an actually licensed CPA subject to MCL 339.725's examination and competency requirements, knew it.

41. Zero is not a rounding error, an approximation, or a placeholder. Under the Second Agreement, Plaintiff's ownership interest is zero percent. Any distribution calculated according to that share is zero multiplied by whatever profits exist -- and zero percent of any number is always zero. Defendant David Sikkema and Defendant Paul Graves understood this arithmetic, yet Defendant Graves said nothing to correct the false impression that signing the Second Agreement preserved any meaningful financial expectation. In fact, Defendant Graves helped structure it.

42. Three years passed after the signing of the Second Agreement. During that time, Plaintiff received no distributions, no accounting from Defendant Paul Graves as CFO or IRS Partnership Representative, no formal evaluation of conditions, and no communication suggesting any intention by Defendants to honor any obligation to him.

43. On or about May 16, 2026, Plaintiff and co-investor Xie sent a written letter to David Sikkema demanding an accounting of the status of their investment and return of their initial capital. (Exhibit B). Because Xie was incarcerated in Pennsylvania and Plaintiff was abroad in China, the letter was sent from the Kirkland, Washington address of Xie's wife, Yile Zhang.

44. Defendant Sikkema's written response on May 20, 2026, directed to both Plaintiff and Xie, stated that "ownership status" was unchanged and that distributions would be made according to shares. He stated that capital calls had been covered on behalf of Plaintiff. He did not address reinstatement. He did not address

return of capital. He closed with expressions of optimism about the Company's future. The letter was issued on Company letterhead (d/b/a Amber Waves) and signed by Sikkema both in his capacity as an officer and representative of the LLC and individually. (Exhibit C).

45. The letter was a performance. Distributions calculated according to shares -- when those shares are zero -- mean no distributions to Plaintiff or to co-investor Xie, both of whom held zero shares under Schedule A to the Second Agreement. The reference to capital calls "covered" on behalf of a member holding zero shares raises more questions than it answers, none of them favorable to Defendants. The letter was calculated to make Plaintiff optimistic while informing him, in riddle-like fashion, that his initial investment was not going to be returned and that his shares had been permanently absorbed.

46. Plaintiff emailed a demand letter to Defendants, including David Sikkema, Paul Graves, Ray Oatman, Larry Sant, and Vasja Treska. All Defendants failed to respond.

47. Paul Graves was aware of the May 2026 letter from David Sikkema, was aware of the financial representations it contained, and took no action to correct, supplement, or disavow those representations, despite his duties as CFO, IRS Partnership Representative, and, in the alternative as alleged in paragraphs 12 through 14 above, either an actually licensed CPA or a person who falsely claimed that credential, to ensure the financial accuracy of communications made on behalf of the LLC to its members.

48. Defendant Paul Graves directed Company marketing work to a personal associate without competitive process and with Defendant Sikkema's acquiescence, in derogation of his duty of loyalty to the LLC and all its members. This conduct is emblematic of the manner in which the LLC was operated -- not as a formal legal entity with proper governance, but as a private arrangement run for the benefit of a given circle. In the alternative, if Graves is found to be a licensed Certified Public Accountant as alleged in paragraph 14 above, this conduct violated MCL 339.734(1)(h) as conduct tending to discredit the accounting profession; if Graves is found to have falsely held himself out as a Certified Public Accountant as alleged in paragraph 13 above, this same conduct is independent evidence of the self-dealing and disregard for the interests of minority members underlying that fraud.

49. The LLC was operated without observance of the financial and governance formalities required of a properly functioning Michigan limited liability company. There was no proper separation between LLC finances and member finances. Capital calls were made without documented notice to affected members. No formal accounting was provided to minority members. Equity was reallocated without proper legal justification.

50. Plaintiff and co-investor Xie were the only two members of Chinese national ancestry in the LLC. All

other members, including all Sikkema family Defendants, are white. No white member's shares were reduced to zero. The pretextual justification for eliminating Plaintiff's membership interest was applied exclusively to the two Chinese members. The Second Agreement provided that if certain conditions were remedied, in the members' opinion, within three years of execution, Plaintiff's and Xie's shares would be reinstated; if the conditions were not remedied within that period, Plaintiff and Xie would be repaid their initial investment.

## CAUSES OF ACTION

### COUNT I - BREACH OF CONTRACT

*Against All Defendants*

51. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

52. The three-year period expired on May 16, 2026. Defendants neither reinstated Plaintiff's and Xie's shares nor repaid their initial investment.

53. The Original Agreement and the Second Agreement are binding contracts among Plaintiff and all Defendants who are signatories thereto. Plaintiff performed all obligations required of him under the agreements. On May 16, 2026, Plaintiff and Xie sent Defendants written notice that litigation was imminent absent resolution. (Exhibit B).

54. Defendants breached the Original Agreement by inducing Plaintiff to exit his membership interest on false pretenses and without any legal or contractual basis, thereby depriving him of the benefits of his bargain, including his six-percent equity interest and any right to distributions and return of capital thereunder. On May 20, 2026, Defendant Sikkema responded in writing, on Company letterhead (d/b/a Amber Waves) and over a corporate signature block, stating that "ownership status" was unchanged, that distributions would be made according to share ownership, and that capital calls had been made and covered on behalf of Plaintiff and Xie. (Exhibit C).

55. Defendants breached the Second Agreement by failing to return Plaintiff's initial investment under any circumstances, by failing to define with any specificity the conditions for reinstatement, by making phantom capital calls without proper documentation, and by issuing communications in 2026 that were deliberately designed to mislead Plaintiff about the status of his original investment.

56. Sikkema's May 20, 2026 representation that capital calls had been made on behalf of Plaintiff and Xie is inconsistent with Schedule A to the Second Agreement, which reflects that Plaintiff and Xie hold no shares against which a capital call could be made.

57. Xie was subsequently convicted of the marijuana-related federal offense referenced above and is currently incarcerated.

58. If Xie's mere charge in 2023 was sufficient to require his and Plaintiff's immediate exit from the Original Agreement, Xie's subsequent conviction represents a materially worse circumstance under Defendants' own stated rationale, not a remedied one. Defendants cannot have it both ways: either the marijuana-related risk they invoked in 2023 was real, in which case it has only gotten worse, or it was never real at all, and the exit was pretext from the start.

59. Plaintiff does not seek reinstatement of his membership interest in the Company and does not consider reinstatement an adequate or acceptable remedy.

60. A party wrongfully deprived of a property interest is not required to accept the return of that interest in lieu of money damages, particularly where, as here, restoration was neither offered nor available until years after the deprivation and only after the wronged party gave notice of intent to sue.

61. The election among available remedies belongs to Plaintiff as the injured party, not to Defendants.

62. Plaintiff's damages, including return of invested capital, lost appreciation, interest, and consequential damages, are not diminished or offset by Defendants' post-notice assertions regarding share status or purported capital calls.

63. Plaintiff had no charges pending against him when he was induced to sign the Second Agreement. His exclusion from the LLC was entirely without legal justification. He was removed because Defendants chose to remove him, and they chose to remove him because his shares were worth taking.

64. As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages in an amount not less than $357,935.25, plus lost distributions, equity appreciation, and all consequential damages.

## COUNT II - BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

*Against All Defendants*

65. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

66. The Original Agreement and the Second Agreement each contained an implied covenant of good faith and fair dealing enforceable under Michigan law. Defendants owed Plaintiff this duty at all times relevant herein.

67. Defendants breached this covenant by fabricating a legal justification for Plaintiff's forced exit that had no basis in Michigan law, by pressuring Plaintiff with artificial urgency while knowing he had no

access to legal counsel, by structuring the Second Agreement to render any promise of repayment mathematically impossible, by failing to provide any accounting or notice of capital calls, by issuing a deliberately evasive response to Plaintiff's demand letter, and by failing to respond at all to his subsequent letter.

68. Defendant Paul Graves' breach of this covenant is particularly serious. His participation in a scheme designed to exploit the good-faith reliance of a minority investor constitutes a betrayal of his contractual duties, and, in the alternative as alleged in paragraphs 12 through 14 above, either a betrayal of the professional standards Michigan law imposes on him as a licensed certified public accountant, or a separate and independent fraud arising from his false claim to hold that professional credential in the first place. Plaintiff has suffered damages as a result of this breach in an amount to be proven at trial.

**COUNT III - FRAUD IN THE INDUCEMENT**

*Against Defendants David Sikkema and Paul Graves*

69. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

70. On or about May 16, 2023, Defendants David Sikkema and Paul Graves made material representations of fact to Plaintiff, namely that Michigan law and the circumstances of co-investor Xie's charge legally required Plaintiff to immediately exit the Original Agreement and surrender his membership interest. Defendants represented that this requirement was urgent and that delay was not an option. Plaintiff relied on those representations and particularly on Graves, whom Plaintiff understood, in reliance on the financial projection document and Graves's own repeated representations described in paragraphs 29 and 30 above, to be a licensed Certified Public Accountant.

71. Every material element of these representations was false. Michigan marijuana licensing law imposes no requirement that a member in good standing exit a licensed entity because a co-investor has been charged. No provision of MCL 333.27958 or any related statute required Plaintiff's exit. No provision of the Original Agreement required it. Plaintiff faced no charges, no conviction, and no regulatory action of any kind.

72. Defendant Sikkema made these representations knowing them to be false, or with reckless disregard for their truth or falsity, with the specific intent of inducing Plaintiff to relinquish his six-percent membership interest so that interest could be absorbed. Defendant Graves, as CFO, made these false representations knowing them to be false. In the alternative, as alleged in paragraphs 12 through 14 above, if Graves was a licensed CPA at the relevant time, his conduct also violated MCL 339.734(1)(h), and his professional standing made the fraud more persuasive and therefore more culpable; if Graves was not a licensed CPA, his claimed professional standing was itself an additional, freestanding misrepresentation

that independently induced Plaintiff's reliance and is independently actionable as alleged in paragraph 13 above.

73. Plaintiff realleges and incorporates paragraphs 12 through 14 and 27 through 28 above, and alleges that Graves's false claim to be a Certified Public Accountant, made both before Plaintiff's initial investment in connection with the financial projection document and again in May 2023, was a material misrepresentation of fact upon which Plaintiff justifiably and reasonably relied, and which was a substantial factor in inducing both Plaintiff's initial investment and his later surrender of his membership interest, independent of and in addition to the other false representations alleged in this Count.

74. Plaintiff justifiably relied on these representations. He was a foreign national located in Mainland China, thousands of miles from legal counsel familiar with Michigan law, given no time to find a lawyer and unable to do so, confronted by the CEO and CFO of the entity in which he had invested his life savings.

75. As a direct and proximate result of his reliance, Plaintiff signed the Second Agreement, surrendered his six-percent membership interest, and lost his entire investment of $357,935.25.

76. Punitive damages against Defendant Sikkema are warranted. Punitive damages against Defendant Graves are warranted in the alternative as follows: if Graves is found to be a licensed Certified Public Accountant as alleged in paragraph 14 above, punitive damages are warranted at a level reflecting the heightened culpability of a licensed professional who exploited his license and public trust to defraud a minority investor; if Graves is found to have falsely held himself out as a Certified Public Accountant as alleged in paragraph 13 above, punitive damages are warranted at the highest level supported by the reprehensibility factors identified in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), and State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003), given that the fabrication of a professional credential to obtain an unsophisticated investor's life savings, and to later induce the surrender of that investment, reflects a particularly high degree of reprehensibility, deliberate deception, and disregard for Plaintiff's financial security.

## COUNT IV - TORTIOUS INTERFERENCE WITH A CONTRACT

*Against David Sikkema and Paul Graves*

77. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

78. Prior to May 16, 2023, Mr. Hu had an existing contractual relationship with 325HTD Growers, LLC governing his membership interest, i.e., the Original Agreement.

79. 325HTD Growers, LLC breached that relationship with Mr. Hu by terminating his membership

interest and requiring him to enter the May 16, 2023 Second Agreement, under which he received a zero-percent membership interest.

80. CEO David Sikkema and CFO Paul Graves unjustifiably instigated that breach, causing the shares taken from Mr. Hu and Mr. Xie to be absorbed into Sikkema's own membership interest and those of his family members, rather than for the benefit of 325HTD Growers, LLC as a whole.

81. Sikkema and Graves were not acting within the legitimate scope of their authority or for the benefit of the LLC; they acted solely, or primarily, for their own personal and familial pecuniary benefit, without any business justification. Their conduct therefore falls outside any privilege ordinarily afforded a corporate officer or manager.

82. As a direct and proximate result, Mr. Hu has been damaged in an amount to be determined at trial, including but not limited to the loss of his membership interest.

## COUNT V - CIVIL CONSPIRACY

*Against All Defendants, and Particularly Against David Sikkema and Paul Graves*

83. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

84. Defendants David Sikkema and Paul Graves, acting in concert and by agreement with the other member-shareholder Defendants, conspired to deprive Plaintiff of his lawful membership interest through a coordinated scheme of false representations and deliberate concealment.

85. Each member-shareholder Defendant who signed the Second Agreement did so with full knowledge, provided by Paul Graves, that the agreement assigned Plaintiff zero percent. (Exhibit D). Their knowing participation constitutes an overt act in furtherance of the conspiracy.

86. Defendants David Sikkema and Paul Graves are the central figures of this conspiracy.

87. As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered the total loss of his membership interest and his investment of $357,935.25, together with all consequential and punitive damages.

## COUNT VI - INTERFERENCE WITH FINANCIAL EXPECTATIONS

*Against David Sikkema and Paul Graves*

88. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

89. Plaintiff entered the LLC with specific, reasonable, and documented financial expectations, including the right to share in LLC profits according to his six-percent membership interest and the return of his initial

capital upon defined conditions.

90. Defendants Sikkema and Graves, through the fraudulent scheme described herein, deliberately and permanently defeated every one of those expectations.

91. Plaintiff is entitled to all damages flowing from this interference.

**COUNT VII - FEDERAL SECURITIES VIOLATION UNDER SECTION 10(b) AND RULE 10b-5**
*Against Defendants David Sikkema and Paul Graves*

92. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

93. Plaintiff's membership interest in 325HTD Growers, LLC constitutes a security within the meaning of the Securities Exchange Act of 1934 under SEC v. W.J. Howey Co., 328 U.S. 293 (1946).

94. Phantom capital calls assessed against a member holding zero shares, combined with the fraudulent inducement of the surrender of that member's security interest and the subsequent transmission of a materially misleading letter (Exhibit C), constitute material misrepresentations and omissions in connection with the purchase and sale of a security under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

95. Defendants Sikkema and Graves acted with scienter.

96. Plaintiff justifiably relied on Defendants' representations in connection with the Second Agreement and the 2026 communications.

**COUNT VIII - BREACH OF FIDUCIARY AND CONTRACTUAL DUTY IN ADMINISTRATION OF THE IRS PARTNERSHIP REPRESENTATIVE ROLE**
*Against CFO Paul Graves Solely*

97. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

98. Under 26 U.S.C. § 6223(a), CFO Paul Graves was designated IRS Partnership Representative ("PR") of 325HTD Growers, LLC under the centralized partnership audit regime enacted by the Bipartisan Budget Act of 2015. The Company and its members, including Mr. Hu, are bound by the PR's actions. 26 U.S.C. § 6223(b); 26 C.F.R. § 301.6223-2.

99. The Treasury Department and IRS have expressly recognized that state-law fiduciary, contractual, and negligence remedies remain available to partners bound by a PR's conduct. T.D. 9839, 83 Fed. Reg. 39331 (Aug. 9, 2018).

100. Mr. Hu was owed a fiduciary and contractual duty requiring CFO Paul Graves to exercise the PR role

in good faith.

101. Plaintiff asserts, upon information and belief and subject to discovery, that CFO Paul Graves breached his duty to administer the PR role in a manner that shifted tax burden onto Mr. Hu while benefiting CEO David Sikkema and his family members.

102. As a direct and proximate result, Mr. Hu has been damaged in an amount to be determined at trial.

**COUNT IX - BREACH OF FIDUCIARY DUTY**

*Against David Sikkema and Paul Graves Primarily; Against All Member-Defendants*

103. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

104. As CEO and CMO, David Sikkema owed fiduciary duties of loyalty, care, and good faith to all members, including Plaintiff.

105. As CFO and IRS Partnership Representative, Paul Graves owed fiduciary duties of the highest order. In the alternative, as alleged in paragraphs 12 through 14 above, if Graves is a licensed Certified Public Accountant, those duties are further amplified by his obligations under MCL 339.734 and Mich. Admin. Code R. 338.5465; if Graves falsely held himself out as a licensed Certified Public Accountant, that misrepresentation is itself a further and independent breach of the duty of loyalty and good faith he owed to Plaintiff as a fellow member of the Company.

106. As members of the Company, the individual Defendants collectively owed duties of loyalty and fair dealing to their fellow members, including Plaintiff, under MCL 450.4515.

107. Defendants breached their fiduciary duties as described throughout this Complaint.

108. As a direct and proximate result, Plaintiff has suffered the damages described herein and is entitled to compensatory and punitive damages, particularly against David Sikkema and, in the alternative as set forth in paragraph 74 above, against Paul Graves.

**COUNT X - WILLFULLY UNFAIR AND OPPRESSIVE CONDUCT UNDER MCL 450.4515**

*Against All Defendants*

109. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

110. Plaintiff is and was at all relevant times a member of the Company within the meaning of the Michigan Limited Liability Company Act, MCL 450.4101 et seq.

111. The managers and members in control of the Company, led by David Sikkema and Paul Graves, engaged in conduct that was illegal, fraudulent, and constituted willfully unfair and oppressive conduct

within the meaning of MCL 450.4515.

112. Under MCL 450.4515(2), the conduct alleged constitutes precisely such willfully unfair and oppressive conduct.

113. Plaintiff is entitled to all relief available under MCL 450.4515.

**COUNT XI - PIERCING THE CORPORATE VEIL AND INDIVIDUAL LIABILITY**

*Against All Defendants*

114. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

115. The LLC was operated by Defendants, particularly David Sikkema and Paul Graves, without regard for the formalities distinguishing a properly functioning limited liability company from a personal financial instrument of its controlling members.

116. The LLC was used as an instrument to perpetrate fraud upon Plaintiff. Michigan law permits piercing the veil where an LLC is used to perpetrate fraud or work an injustice on a member. MCL 450.4515 and applicable Michigan common law.

117. Each Defendant who signed the Second Agreement, accepted the redistributed equity, and participated in the operation of the entity is individually liable to Plaintiff for all damages alleged herein.

**COUNT XII - PROMISSORY ESTOPPEL**

*Against All Defendants*

118. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

119. Defendants, through the Second Agreement and verbal representations by Sikkema and Graves at execution, promised Plaintiff that his initial investment of $357,935.25 would be returned under certain conditions.

120. Plaintiff reasonably and justifiably relied on those promises in signing the Second Agreement and in refraining from pursuing other legal remedies for three years.

121. Plaintiff's reliance was to his substantial detriment.

122. Injustice can only be avoided by enforcement of these promises.

123. Plaintiff is entitled to recover his initial investment of $357,935.25 together with all consequential damages.

**COUNT XIII - UNJUST ENRICHMENT**

*Against All Defendants*

124. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

125. Plaintiff conferred a benefit upon Defendants in the amount of $357,935.25 through his capital contribution, and through the six-percent membership interest he was induced to surrender. That equity was redistributed to the Sikkema family Defendants, who retained it without providing Plaintiff any return.

126. It would be unjust and inequitable to permit Defendants to retain the benefit of Plaintiff's investment and equity while Plaintiff has received nothing. Plaintiff is entitled to restitution in the full amount of his investment together with any appreciation during his wrongful exclusion from the LLC.

**COUNT XIV - DISPARATE TREATMENT AND DISCRIMINATION**

*Against All Defendants*

127. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

128. Plaintiff and co-investor Fei Xie were the only two members of Chinese national ancestry in 325HTD Growers, LLC. No white member was subjected to any comparable demand.

129. The rationale offered -- that Xie's charge triggered an obligation for both Chinese members to exit -- admits of no non-discriminatory explanation.

130. Plaintiff brings his discrimination claims pursuant to 42 U.S.C. § 1981.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Boxun Hu respectfully requests that this Court enter judgment in his favor and against all Defendants, jointly and severally, and award the following relief:

A. Compensatory damages in an amount to be proven at trial, including return of Plaintiff's initial investment of $357,935.25, lost distributions, lost equity appreciation, and all consequential damages;

B. Punitive damages against all Defendants, with the highest award against Defendant Sikkema (no less than $1,500,000); and, against Defendant Graves, in the alternative: (i) no less than $1,250,000 if Graves is found to be a licensed Certified Public Accountant who exploited that license to defraud Plaintiff, as alleged in paragraph 14 above; or (ii) an amount at the highest level the evidence and due process will support -- reflecting the outer bound of what is constitutionally permissible under BMW of North America, Inc. v. Gore and State Farm Mutual Automobile Insurance Co. v. Campbell -- if Graves is found to have falsely held himself out as a Certified Public Accountant to defraud an unsophisticated investor of his life savings, as alleged in paragraph 13 above;

C. Equitable relief under MCL 450.4515, including a complete accounting of all LLC financial activity from November 9, 2020 to the present and disgorgement of benefits received by the Sikkema family Defendants;

D. A full, complete, and independently audited accounting of all capital calls, distributions, financial transactions, and equity transfers from the date of the Original Agreement to the present;

E. Disgorgement of all profits, equity appreciation, and other benefits received by Defendant David Sikkema and the Sikkema family Defendants, together with pre-judgment interest;

F. Statutory damages and all relief available under Section 10(b) and Rule 10b-5, including rescission of the Second Agreement as it relates to Plaintiff's security interest;

G. Statutory damages and all relief available under 42 U.S.C. § 1981;

H. An injunction prohibiting Defendants from transferring, encumbering, pledging, dissipating, or otherwise disposing of LLC assets or assets traceable to Plaintiff's investment, pending resolution of this action;

I. An injunction requiring Defendants to preserve all financial records, operating agreements, membership ledgers, capital call notices, distribution records, and communications relating to Plaintiff's membership interest;

J. Pre-judgment interest at the maximum rate permitted by law;

K. Post-judgment interest at the maximum rate permitted by law until paid in full;

L. Reasonable attorney fees and costs to the extent permitted by law, including under 42 U.S.C. § 1981;

M. Such other and further relief as this Court deems just, equitable, and proper.

**<u>JURY DEMAND</u>**

Plaintiff Boxun Hu hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Boxun Hu
Plaintiff, Pro Se

Aug 15 2026

# EXHIBIT A

MICHIGAN LEGISLATURE

Michigan Compiled Laws Complete Through PA 20 of 2026

Senate adjourned until Wednesday, August 12, 2026 10:00 AM

House adjourned until Tuesday, August 11, 2026 1:30 PM

Home Legislature Laws More Sign Up Log In

# MCL - Section 333.27958

Download Section

Chapter 333

Initiated Law 1 of 2018

Previous Section Next Section

## MICHIGAN REGULATION AND TAXATION OF MARIHUANA ACT (EXCERPT)

### Initiated Law 1 of 2018

#### 333.27958 Rules; limitations.

Sec. 8.

(1) The cannabis regulatory agency shall promulgate rules to implement and administer this act that include all of the following:

(a) Procedures for issuing a state license pursuant to section 9 and for renewing, suspending, and revoking a state license.

(b) A schedule of fees in amounts not more than necessary to pay for implementation, administration, and enforcement costs of this act and that relate to the size of each licensee or the volume of business conducted by the licensee.

(c) Qualifications for licensure that are directly and demonstrably related to the operation of a marihuana establishment. However, a prior conviction solely for a marihuana-related offense must not disqualify an individual or otherwise affect eligibility for licensure, unless the offense involved distribution of a controlled substance to a minor.

(d) Requirements and standards for safe cultivation, processing, and distribution of marihuana by marihuana establishments, including health standards to ensure the safe preparation of marihuana-infused products and prohibitions on pesticides that are not safe for use on marihuana.

(e) Testing, packaging, and labeling standards, procedures, and requirements for marihuana, including, but not limited to, all of the following:

(i) A maximum THC level for marihuana-infused products.

(ii) A requirement that a representative sample of marihuana be tested by a marihuana safety compliance facility.

(iii) A requirement that the amount of marihuana or marihuana concentrate contained within a marihuana-infused product be specified on the product label.

(iv) A requirement that all marihuana sold through marihuana retailers and marihuana microbusinesses include on the exterior of the marihuana packaging the following warning printed in clearly legible type and surrounded by a continuous heavy line:

WARNING: USE BY PREGNANT OR BREASTFEEDING WOMEN, OR BY WOMEN PLANNING TO BECOME PREGNANT, MAY RESULT IN FETAL INJURY, PRETERM BIRTH, LOW BIRTH WEIGHT, OR DEVELOPMENTAL PROBLEMS FOR THE CHILD.

(f) Security requirements, including lighting, physical security, and alarm requirements, and requirements for securely transporting marihuana between marihuana establishments. The requirements described in this subdivision must not prohibit cultivation of marihuana outdoors or in greenhouses.

(g) Record keeping requirements for marihuana establishments and monitoring requirements to track the transfer of marihuana by licensees.

(h) Requirements for the operation of marihuana secure transporters to ensure that all marihuana establishments are properly serviced.

(i) Reasonable restrictions on advertising, marketing, and display of marihuana and marihuana establishments.

(j) A plan to promote and encourage participation in the marihuana industry by people from communities that have been disproportionately impacted by marihuana prohibition and enforcement and to positively impact those communities.

(k) Penalties for failure to comply with a rule promulgated pursuant to this section or for a violation of this act by a licensee, including civil fines and suspension, revocation, or restriction of a state license.

(l) Informational pamphlet standards for marihuana retailers and marihuana microbusinesses, including, but not limited to, a requirement to make available to every customer at the time of sale a pamphlet measuring 3.5 inches by 5 inches that includes safety information related to marihuana use by minors and the poison control hotline number.

(m) Procedures and standards for approving an appointee to operate a marihuana establishment under section 9a.

(n) A limit on the total amount of THC that a product described in section 3(f)(v)(A) may contain.

(2) The cannabis regulatory agency may promulgate rules to do any of the following:

(a) Provide for the issuance of additional types or classes of state licenses to operate marihuana-related businesses, including licenses that authorize any of the following:

(i) Limited cultivation, processing, transportation, delivery, storage, sale, or purchase of marihuana.

(ii) Consumption of marihuana within designated areas.

(iii) Consumption of marihuana at special events in limited areas and for a limited time.

(iv) Cultivation for purposes of propagation.

(v) Facilitation of scientific research or education.

(b) Regulate the cultivation, processing, distribution, and sale of industrial hemp.

(c) Exclude from the definition of THC in section 3 a tetrahydrocannabinol if, after the cannabis regulatory agency makes findings with respect to each of the following factors, the cannabis regulatory agency determines that the tetrahydrocannabinol does not have a potential for abuse:

(i) The actual or relative potential for abuse of the tetrahydrocannabinol.

(ii) The scientific evidence of the tetrahydrocannabinol's pharmacological effect, if known.

(iii) The state of current scientific knowledge regarding the tetrahydrocannabinol.

(iv) The history and current pattern of abuse of the tetrahydrocannabinol.

(v) The scope, duration, and significance of abuse of the tetrahydrocannabinol.

(vi) The tetrahydrocannabinol's risk to the public health.

(vii) The potential of the tetrahydrocannabinol to produce psychic or physiological dependence liability.

(3) The cannabis regulatory agency shall not promulgate a rule that is unreasonably impracticable or that does any of the following:

(a) Establishes a limit on the number of any type of state license that may be granted.

(b) Requires a customer to provide a marihuana retailer with identifying information other than identification to determine the customer's age or requires the marihuana retailer to acquire or record personal information about customers other than information typically required in a retail transaction.

(c) Prohibits a marihuana establishment from operating at a shared location of a marihuana facility operating pursuant to the medical marihuana facilities licensing act, 2016 PA 281, MCL 333.27101 to 333.27801, or prohibits a marihuana grower, marihuana processor, or marihuana retailer from operating within a single facility.

(4) A rule promulgated under this act must be promulgated pursuant to the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328.

**History:** 2018, Initiated Law 1, Eff. Dec. 6, 2018 ;-- Am. 2020, Act 31, Imd. Eff. Feb. 20, 2020 ;-- Am. 2020, Act 208, Imd. Eff. Oct. 15, 2020 ;-- Am. 2021, Act 56, Eff. Oct. 11, 2021 ;-- Am. 2023, Act 166, Imd. Eff. Oct. 19, 2023

**Compiler's Notes:** This new act was proposed by initiative petition pursuant to Const. 1963, art 2, section 9. The proposed language was certified to the legislature on April 26, 2018 with the 40-day consideration period lapsing on June 5, 2018. The initiative petition was submitted to the voters as proposal 18-1 at the November 6, 2018 general election where it was approved 2,356,422 for and 1,859,675 against.For the transfer of powers and duties of the department of licensing and regulatory affairs, including its bureau of marijuana regulation, to the marijuana regulatory agency, and abolishment of the bureau of marijuana regulation, see E.R.O. No. 2019-2, compiled at MCL 333.27001.For the transfer of powers and duties of the department of licensing and regulatory affairs to promulgate rules to regulate industrial hemp to the department of agriculture and rural development by type II transfer, see E.R.O. No. 2019-2, compiled at MCL 333.27001.For the renaming of the marijuana regulatory agency to the cannabis regulatory agency, see E.R.O. No. 2022-1, compiled at MCL 333.27002.For the renaming of the marijuana regulatory agency to cannabis regulatory agency; establishment of the authority of the cannabis regulatory agency to promulgate rules to regulate the cultivation, processing, distribution, and sale of industrial hemp, and transfer of the authority of the cannabis

regulatory agency to promulgate rules to regulate the cultivation of industrial hemp to the department of agriculture and rural development, see E.R.O. No. 2022-1, compiled at MCL 333.27002.

Acceptable Use Policy Privacy Policy DMCA Policy Comment Form
Legislative Directory Accessibility Site Map

Bills Meetings Laws

The Michigan Legislature Website is a free service of the Legislative Service Bureau in cooperation with the Michigan Legislative Council, the Michigan House of Representatives, the Michigan Senate, and the Library of Michigan. This site is intended to provide accurate and timely legislative information to the citizens of the State of Michigan and other interested parties. Additional historical documents can be found at https://www.michigan.gov/libraryofmichigan. The information obtained from this site is not intended to replace official versions of that information and is subject to revision. The Legislature presents this information, without warranties, express or implied, regarding the accuracy of the information, timeliness, or completeness. If you believe the information is inaccurate, out-of-date, or incomplete or if you have problems accessing or reading the information, please send your concerns to the appropriate agency using the online Comment Form in the bar above this text.

# EXHIBIT B

EXHIBIT B

May 16, 2026

David Sikkema
Chief Executive Officer
325HTD Growers, LLC
325 Hammontree Dr.
Morenci, MI 49256

**Re: Amended and Restated Operating Agreement of 325HTD Growers, LLC**

Dear Dave:

I hope this letter finds you and your family well, and that all is going well with you and the company.

I am writing regarding the Amended and Restated Operating Agreement of 325HTD Growers, LLC (the "Agreement"), entered into and effective as of May 16, 2023.

As set forth in the Agreement:

> *"Due to certain circumstances, Fei Xie and Boxun Hu shares have been temporarily changed to 0%. After three years or sooner, if certain circumstances are deemed by owners to be remedied, Fei and Boxun will be reinstated as owners at 12%. If not, they will be paid back their initial investment."*

May 16, 2026 marks the three-year anniversary of the effective date of the Agreement. Regrettably, the "certain circumstances" referenced above remain unchanged and have not been remedied. Accordingly, pursuant to the terms of the Agreement, our initial investment of $620,000 in principal—as confirmed by the accounting information provided by Chief Financial Officer Paul Graves—is now due and payable to us.

Please remit payment at your earliest convenience by wire transfer or direct deposit to the following account:

**Account Holder:** Fei Xie
**Account Number:** XXXXXX5141
**Routing Number (ACH/Direct Deposit):** XXXXX8547
**Routing Number (Domestic Wire):** XXXXX0248
**Wire Memo:** "Return of Initial Investment"

I truly believe Amber Waves will continue to thrive under your leadership, and I am confident that the recent developments around marijuana rescheduling will only enhance the company's success and value. I deeply appreciate your mentorship and trust over the years—it has been a true blessing to have you as both a mentor and a friend. I sincerely wish circumstances had allowed us to continue being part of your success.

I look forward to hearing from you.

Very truly yours,

Fei Xie

Boxun Hu

# EXHIBIT C

AMBERWAVES CORPORATION

May 20, 2026

To: Fei Xie, Boxun Hu

Re: Response to your letter, Amended & Restated Operating A*greement*

Dear Fei,

All is well with the family (thank you for asking) and the business is running more efficiently and is in the process of paying off debts. We are encouraged that our product is improving, and we have efficient procedures that will keep us competitive.

Ownership status is unchanged. There have been capital calls that I have covered on your behalf.

If the company ever turns a profit, distribution will be made according to shares.

I'm confident that we will continue to grow, refine our strengths, and achieve success. Our dedication, teamwork, and resilience will keep driving us forward towards our goals.

Sincerely,

David Sikkema

Amberwaves

# EXHIBIT D

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**325HTD GROWERS, LLC**

THIS AMENDED AND RESTATED OPERATING AGREEMENT (the "Agreement") of 325HTD Growers, LLC, a Michigan limited liability company (the "Company") is entered into and effective as of May 16, 2023, by and among each person whose name and signature appears at the end of this Agreement as members and such persons who may become members of the Company (individually, a "Member" and collectively, the "Members"). It should also be noted that due to certain circumstances, Fei Xie and Boxun Hu shares have been temporarily changed to 0%. After three years or sooner, if certain circumstances are deemed by owners to be remedied, Fei and Boxun will be reinstated as owers at 12%. If not, they will be paid back their initial investment.

**RECITALS:**

A. On November 9, 2020, the Members of the Company executed an Operating Agreement for the Company (the "Original Agreement").

B. The Members wish to amend and restate the Original Agreement, in its entirety, and be bound by this Agreement, which reflects the agreement of the Members as to the future conduct of the Company's business.

C. This Agreement supersedes all prior agreements, amendments, arrangements and understandings related to the subject matter hereof, including but not limited to the Original Agreement.

NOW, THEREFORE, the Members agree as follows:

**ARTICLE I**

**GENERAL PROVISIONS; DEFINITIONS**

Section 1.1 Formation of the Company; Term. 325HTD LLC (the "Company") was formed effective as of November 9, 2020, pursuant to the Michigan Limited Liability Company Act, MCL 450.4101 et. seq. (the "Act"), by the execution and filing of articles of organization of the Company with the Michigan Department of Licensing and Regulatory Affairs (the "Department") setting forth the information required by the Act (the "Articles"). The term of the Company commenced upon the filing of the Articles and shall continue in perpetuity until the dissolution and termination of the Company in accordance with the provisions of Article VIII hereof.

Section 1.2 Operating Agreement. The Members have entered into this Agreement for the purpose of establishing the affairs of the Company and the conduct of its business in accordance with the provisions of the Act. The Members hereby agree that during the term of the Company set forth in Section 1.1, the rights and obligations of the Members with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and, except where the Act provides that such rights and obligations specified in the Act shall apply

"unless otherwise provided in an operating agreement" or words of similar effect and such rights and obligations are set forth in this Agreement, the provisions of the Act shall govern.

Section 1.3 Name. The name of the Company shall be "325HTD Growers, LLC" or such other name or names as may from time to time be designated by the Managers. The Company's business may be conducted under its name and/or any other name or names as the Managers may deem advisable.

Section 1.4 Purpose and Powers. The Company is organized for the object and purpose of (a) operating businesses involved in various activities that require licensure under Marijuana Law and (b) engaging in any other act or activity and to exercise any powers permitted to limited liability companies organized under the Act. The Company shall have any and all powers necessary or desirable to carry out the purposes and business of the Company, to the extent that the same may be lawfully exercised by limited liability companies under the Act.

Section 1.5 Principal Office; Registered Office and Agent. The principal office of the Company shall be located at such place (whether inside or outside the State of Michigan) as the Managers may from time to time designate. The Company may have such other offices (whether inside or outside the State of Michigan) as the Managers may from time to time designate. The registered office and resident agent of the Company shall be as designated in the Articles or any amendment thereof.. The Managers may, in its discretion, change the registered office and/or registered agent from time to time by (a) filing the address of the new registered office and/or the name of the new registered agent with the Department pursuant to the Act and (b) giving notice of such change to each of the Members.

Section 1.6 Tax Characterization. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and the Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

Section 1.7 Definitions. Capitalized terms used but not otherwise defined in this Agreement shall have the following meanings:

"Adjusted Capital Account Deficit" means with respect to any Capital Account as of the end of any Taxable Year, the amount by which the balance in such Capital Account is less than zero. For this purpose, a Member's Capital Account balance shall be: (a) reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6), and (b) increased for any amount such Member is obligated to contribute or is treated as being obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) or 1.704-2(g)(1) and 1.704-2(i) (relating to minimum gain).

"Affiliate" of any Person means (a) any other Person controlling, controlled by or under common control with such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, and (b) if such Person is a partnership, any general partner thereof.

"Assumed Tax Rate" means, for any Taxable Year, the highest marginal combined federal, state and local income tax rate (reduced by any deduction or credit allowable for state and local taxes and reflecting any reduced rate applicable to any special class of income) to which any Member may be subject for such Taxable Year.

"Book Value" means, with respect to any Company property, the value of the property for "book" or Capital Account purposes pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the preceding sentence: (a) the initial Book Value of any property contributed by a Member to the Company will be the fair market value of the property on the date of the contribution, as reasonably determined by the Managers; and (b) the Book Value of all Company properties shall be adjusted to equal their respective fair market values (as determined by the Managers), in accordance with the rules set forth in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), immediately prior to: (i) the date of the acquisition of any additional interest in the Company by any additional or existing Member in exchange for more than a *de minimis* Capital Contribution, (ii) the date of the distribution of more than a *de minimis* amount of Company property to a Member for an interest in the Company and (iii) in connection with the grant of any Membership Interest or any other interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member, or by a new Member acting in a Member capacity or in anticipation of being a Member; provided, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Managers reasonably determines that the adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Book Value of any Company property that is distributed to any Member shall be adjusted immediately prior to the distribution to equal its fair market value. If any asset has a Book Value that differs from its adjusted tax basis, then the Book Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profits" and "Losses" rather than the amount of depreciation determined for United States federal income tax purposes.

"Capital Contributions" means the amount of any cash or cash equivalents and the fair market value of other property that a Member contributes or is deemed to contribute hereunder to the Company with respect to a Membership Interest, as determined by the Managers.

"Capital Event Proceeds" shall mean the net cash proceeds received by the Company, from any sale or other disposition of all or any part of the Company's assets, after payment of, or provision for, all Company debts and obligations required or permitted to be paid upon, or incurred or established in connection with, the receipt by the Company of such proceeds; and all expenses incurred by the Company in connection with the transaction giving rise to such proceeds.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company Business" means any business that is engaged in, directly or indirectly, in the cultivation, harvesting, production, processing, marketing, distribution, sale, transfer, possession, and use of cannabis, marijuana, or related substances or products containing cannabis, marijuana, or related substances, including all employment, consulting, training, investing or financing activities related to or incidental to the foregoing.

"Disability", means (a) with respect to a Service Provider Member, the meaning of such term set forth in any written employment or contractor agreement with the Company and (b) with respect to a Manager or any Service Provider Member that does not have a written agreement that defines such term, that such Manager or Service Provider Member is unable to perform the essential functions and responsibilities of a Manager or employee/contractor, as applicable (as determined by an independent physician selected by the Managers), after reasonable accommodation, as required under the Americans with Disabilities Act, as amended (the "ADA"), by virtue of physical or mental disability, as defined under the ADA, for a period of six (6) months in any twenty four (24) month period.

"Distribution" means each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise; provided, that a Distribution shall not include any payments to employees or other service providers as compensation or any recapitalization or exchange of securities of the Company, or any subdivision or any combination of any outstanding Membership Interest.

"Estate Planning Entity" means, with respect to any Member who is an individual, (a) any trust that has been established for the primary benefit of such Member or such Member's lineal descendants, spouse or siblings and of which such individual is the trustee, and (b) any family limited partnership, limited liability company or corporation that at the time is, and at all times thereafter shall be, controlled by such individual, provided that, in each of the cases described in subsections (a) and (b) above, the Transferring Member retains sole voting control over and decision-making authority under this Agreement with respect to the Membership Interest transferred to such entity. Upon such time as the Transferring Member loses such control and decision-making authority, the transferee shall no longer be deemed an Estate Planning Entity and a "Transfer" shall be deemed to have occurred pursuant to Section 7.1(a).

"Excess Cash" means, at any time, that portion of the cash and cash equivalent assets of the Company that the Managers determine, in their sole discretion, exceeds the amount of cash needed by the Company to (a) remain "solvent," (b) maintain adequate working capital and reserves, and (c) conduct its business and carry out its purposes. In making this determination, the Managers shall take into account the Company's then current and foreseeable sources of, and needs for, cash and shall pay off all interest bearing debt prior to making any Distributions (other than Tax Distributions) under this Agreement. For the purposes of this definition, the Company is "solvent" if it is capable of paying its debts as they become due in the usual course of business or the value of its assets is equal to or greater than the sum of its liabilities. This definition of the term "solvent" is intended to override, to the extent permitted under the Act, any inconsistent provisions of the Act. Excess Cash shall not include Capital Contributions made by the Members or Capital Event Proceeds.

"Financing" means any loans or indebtedness that are incurred by the Company to further the purposes of the Company, including any mortgage loans.

"Fiscal Year" means the Company's annual accounting period established pursuant to Section 9.3.

"Governmental Authority" means any federal, state, provincial, municipal, local, or foreign government or political subdivision thereof, or any agency, bureau, board, commission, or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

"Majority Interest" means those Members holding, in the aggregate, Membership Interest that exceed fifty percent (50%) of all the Membership Interest of the Company.

"Marijuana Law" means, collectively, the Michigan Medical Marihuana Act, MCL 333.26421 et seq., the Michigan Regulation and Taxation of Marihuana Act, MCL 333.27951 et seq. and any other statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority related to, directly or indirectly, the ownership, cultivation, harvesting, production, processing, marketing, distribution, sale, transfer, possession, and use of cannabis, marijuana, or related substances or products containing cannabis, marijuana, or related substances, in each case, as applicable to the Company and its subsidiaries.

"Manager" means each of the representative or representative initially named or duly elected as a Manager of the Company, as provided in Section 5.3.

"Member" means each Person who is admitted to the Company as a Member pursuant to Section 2.1 or 7.2, in each case so long as such Person continues to hold any Membership Interest.

"Membership Interest" means a Member's interest in the Company, which for a Member is described as the percentage of all the outstanding Membership Interest of the Company, and the Member's interest in the Profits, Losses and Distributions of the Company representing a fractional part of the aggregate interests in the Profits, Losses, and Distributions of the Company of all Members and shall include any additional classes of Membership Interest authorized under this Agreement; provided, that any class or group of Membership Interest issued shall have the relative rights, powers, duties, and obligations specified with respect to such class or group of Membership Interest in this Agreement, and the interest of such class or group of Membership Interest in the Profits, Losses, and Distributions of the Company shall be determined in accordance with such relative rights, powers, duties, and obligations.

"Minimum Gain" means the partnership minimum gain determined pursuant to Treasury Regulation Section 1.704-2(d).

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Repurchase Value" shall mean, with respect to any vested Membership Interest held by any Service Provider Member (or the Permitted Transferee or other Affiliate thereof) upon the Termination of Service of such Service Provider Member, (a) if such Termination of Service is due to such Service Provider Member's death or Disability or the termination of such Service

Provider Member by the Company without "Cause" (as such term may be defined in an employment or contractor agreement between such Service Provider Member and the Company, subsidiary or other Affiliate), the fair market value of such Membership Interest, as determined by the Company's accountants in their sole discretion, but excluding any discounts for lack of marketability or control, or (b) if such Termination of Service occurs for any other reason (including a termination by the Company for "Cause" or termination by the Service Provider Member), $1.00.

"Sale of the Company" means (i) any sale of all or substantially all of the assets of the Company and its subsidiaries on a consolidated basis in one transaction or series of related transactions, (ii) any sale of a Membership Interest entitled to receive a majority of the distributions in accordance with this Agreement in any one transaction or series of related transactions, in each case, to an unaffiliated third party in a bona fide transaction or (iii) a merger, consolidation, recapitalization, exchange of capital stock or other transaction that accomplishes the result contemplated by clause (i) or (ii) above, in each case, to an unaffiliated third party in a bona fide transaction.

"Service Provider Member" means each Member who has either (i) entered into an employment agreement with the Company or any of its subsidiaries or other Affiliates, or (ii) been designated as a Service Provider Member at the time such Member receives Membership Interest.

"Service Provider Membership Interest" means any Membership Interest held by a Service Provider Member, unless otherwise designated by the Managers that such Membership Interest shall not be Service Provider Membership Interest. A Service Provider Member may own both Membership Interest and Service Provider Membership Interest.

"Tax Amount" means, with respect to any Member for any Taxable Year, an amount equal to the product of (a) the Assumed Tax Rate, multiplied by (b) the excess, if any, of (i) the net taxable income allocated by the Company to such Member pursuant to Section 3.4(a) for such Taxable Year over (ii) any net taxable loss allocated by the Company to such Member for any prior Taxable Year not previously taken into account hereunder.

"Taxable Year" means the Company's annual accounting period for federal income tax purposes determined pursuant to Section 9.4(a).

"Termination of Service" means the occurrence of any act or event (including death or Disability), whether pursuant to a written agreement or otherwise, that actually causes or results in a Service Provider Member ceasing to be an officer, independent contractor, director, Manager or employee of the Company or of any of its subsidiaries or other Affiliates.

"Treasury Regulations" means the income tax regulations promulgated under the Code.

"Membership Interest" means a Member's interest in the Profits, Losses and Distributions of the Company representing a fractional part of the aggregate interests in the Profits, Losses, and Distributions of the Company of all Members and shall include any additional classes of Membership Interest authorized under this Agreement; provided, that any class or group of Membership Interest issued shall have the relative rights, powers, duties, and obligations specified

with respect to such class or group of Membership Interest in this Agreement, and the interest of such class or group of Membership Interest in the Profits, Losses, and Distributions of the Company shall be determined in accordance with such relative rights, powers, duties, and obligations.

Section 1.8 Other Definitions. The following terms shall have the meanings defined for such terms in the sections set forth below:

| Term | Section |
|---|---|
| Act | Preamble |
| Agreement | Preamble |
| Articles | 1.1 |
| Capital Account | 2.2(a) |
| Company | 1.1 |
| Company Sale Notice | 6.9(a) |
| Confidential Information | 6.7 |
| Defaulting Member | 2.7(b) |
| Department | 1.1 |
| Disqualified Member | 7.5(a) |
| Disqualified Member Notice | 7.5(a) |
| Election Notice | 6.8(a) |
| Equity Owners | 9.6(d) |
| Excluded Securities | 6.8(c) |
| Former Member | 9.6(c) |
| JRHW | 10.16 |
| Indemnified Person | 5.4(a) |
| Initial Managers | 5.3(a) |
| Issuance Notice | 6.8(a) |
| Losses | 2.2(b) |
| Member Loan | 2.6 |
| Non-Defaulting Member | 2.7(b) |
| Omitted Contribution | 2.7(b) |
| Permitted Family Member | 7.1(c) |
| Permitted Transferee | 7.1(c) |
| PR | 9.6(a) |
| Profits | 2.2(b) |
| Proposed Equity Interests | 6.8(a) |
| Presenting Member | 6.6(a) |
| Purchase Price | 7.5(e) |
| Sale Documentation | 6.9(a) |
| Tax Distribution | 3.1(c) |
| Transfer | 7.1(a) |
| Transferring Member | 7.1(a) |
| Underpayment Share | 9.6(d) |

## ARTICLE II

## CAPITAL CONTRIBUTIONS AND ACCOUNTS

Section 2.1 Authorized Membership Interest; Issuance of Membership Interest and Capital Contributions. In connection with the execution of this Agreement, each Member has made (or agreed to make) the initial as set forth on the books and records of the Company and the Company has issued each Member the Membership Interest listed opposite such Member's name on Schedule A.

Section 2.2 Capital Accounts.

(a) The Company shall establish and maintain a separate capital account for each Member according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv) (a "Capital Account").

(b) For purposes of computing the amount of any item of Company income, gain, loss or deduction to be allocated pursuant to Article III and to be reflected in the Capital Accounts, "Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Section 703(a) of the Code (including all items required to be stated separately) with the following adjustments:

(i) The computation of all items of income, gain, loss and deduction shall include those items described in Code Section 705(a)(l)(B) or Code Section 705(a)(2)(B) and Treasury Regulation Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includable in gross income or are not deductible for federal income tax purposes.

(ii) If the Book Value of any Company property is adjusted pursuant to clause (b) of the definition of "Book Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property.

(iii) Items of income, gain, loss or deduction attributable to the disposition of Company property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the Book Value of such property.

(iv) Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*).

(v) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

(vi) Items of income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such Distribution at a price equal to its fair market value at that date.

(vii) Any items that are specially allocated pursuant to Section 3.3(a) – (c), or that are allocated solely for federal income tax purposes pursuant to Section 3.4, shall be excluded from the determination of Profits and Losses.

Section 2.3 Negative Capital Accounts. No Member shall be required to pay to any other Member or the Company any deficit or negative balance that may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

Section 2.4 No Interest. Except as otherwise expressly provided in this Agreement, no Member shall be entitled to receive interest from the Company in respect of any positive balance in its Capital Account, and no Member shall be liable to pay interest to the Company in respect of any negative balance in its Capital Account.

Section 2.5 Financing. Subject to the Manager obtaining the consent of a Majority Interest, the Company may obtain Financing for the Company. The Financing shall be on terms that are acceptable to the Manager, in the Manager's discretion; provided, that no Member shall be required to provide a guaranty with respect to a Financing without such Member's prior consent. Subject to the Manager obtaining the Consent of the Members, the Manager shall have the right and authority to execute such documents, including without limitation promissory notes, loan agreements, security agreements and mortgages which the Manager determine are necessary or desirable to obtain any such Financing. If personal guaranties are required by the lender as a condition to obtaining any Financing, the Members, may, but shall not be obligated to, provide such guaranties. Regardless of whether a lender requires that Financing guaranties be on a joint and/or several basis, and regardless of whether all of the guarantors execute and deliver guaranties, if any one or more of the guarantors shall become liable for and in fact repay any portion of the Financing pursuant to its guaranty, the other guarantors shall be liable to pay to such guarantor, upon demand, for their respective shares of the total obligation incurred, based upon fraction the numerator of which is such guarantor's respective Membership Interest in the Company and the denominator of which is the total Membership Interests of all of the guarantors.

Section 2.6 Member Loans to the Company. If any Member agrees, with the consent of the Manager, to loan funds to the Company, together with interest thereon at the rate established by the Manager (a "Member Loan"), all amounts due and owning on such a loan shall be repaid prior to any distributions of Net Cash or other distributions by the Company to the Members. In the event any Member desires to make a Member Loan to the Company, the other Members shall have the opportunity to participate in making such Member Loan on a pro rata basis, in accordance with their respective Membership Interest.

Section 2.7 Additional Capital Contributions.

(a) Except as provided in Section 2.1 above, no Member shall have the obligation to contribute additional capital to the Company. If the Manager determines that the

Company requires additional capital, then the Manager may request a vote of the Members to approve such request. Any such approval shall require the consent of the Members holding not less than 75% of the Membership Interest of the Company. Upon such consent, the Members shall contribute their pro rata share of the approved additional capital in accordance with their Membership Interest.

(b) If the Members agree to make further capital contributions and any Member fails or refuses to contribute its share of the additional funds required under Section 2.7(a) hereof by the reasonable deadline as established by the Manager, which shall be no less than fifteen (15) days following approval by the Members of such addition capital contribution (such Member being herein referred to as the "Defaulting Member" and such amount being herein referred to as the "Omitted Contribution"): (1) the Member(s) who did contribute its respective share(s) of the additional funds required pursuant to Section 2.7(a) hereof (a "Non-Defaulting Member") may advance the Omitted Contribution to the Company; and/or (2) the Manager may sell Membership Interest to a third party reasonably agreeable to all the current Members. Upon the advance of the Omitted Contribution by a Member or sale of new Membership Interest, the Membership Interest of the Members as in effect immediately prior to such Omitted Contribution shall be re-determined according to reasonable agreement by the Members approving the additional capital contributions, taking into account the valuation of the Company prior to such.

Section 2.8 No Withdrawal. No Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any Distribution from the Company, except as expressly provided in this Agreement.

Section 2.9 Safe Harbor Election. The Managers are hereby authorized and directed (a) to add the provisions described in proposed Treasury Regulation Section 1.704-1(b)(4)(xii) regarding the making of "forfeiture allocations" and the provisions described in proposed Treasury Regulation Section 1.83-3(l) necessary for the Company to make the "safe harbor election" if such proposed Treasury Regulations are issued in final form, in accordance with such final Treasury Regulations, and (b) to make such election. The Members hereby provide their consent to and agreement with such additional provisions and the making of such election.

## ARTICLE III

## DISTRIBUTIONS AND ALLOCATIONS

Section 3.1 Distributions.

(a) Distributions of Excess Cash. Except as provided in Section 3.1(c), the Company shall make Distributions to the Members of Excess Cash, at such times as may be determined by the Managers to all Members, pro rata among them, in proportion to their Membership Interest.

(b) Distributions of Capital Event Proceeds. Except as provided in Section 3.1(c), the Company shall make Distributions to the Members of Capital Event Proceeds, pro rata among them, in proportion to their respective Membership Interest.

(c) Tax Distributions. To the extent that any Member's Tax Amount for any Taxable Year exceeds the amount of Distributions made to such Member during such Taxable Year (other than Tax Distributions made for the prior Taxable Year), the Company shall make a Distribution to such Member on or before March 31 of the next following Taxable Year in an amount equal to such excess (a "Tax Distribution"). Tax Distributions made on any date pursuant to this Section 3.1(b) shall be treated as Distributions made pursuant to Section 3.1(a); provided, that if any Tax Distribution distributed to a Member pursuant to this Section 3.1(b) on such date exceeds the total amount that would otherwise have been distributed to such Member pursuant to Section 3.1(a) on such date (i.e., in the absence of this Section 3.1(b)), then the amount of such excess shall be treated as an advance to such Member of Distributions pursuant to Section 3.1(a) and shall be offset against future Distributions to such Member under Sections 3.1(a) or 8.2.

(d) No Member Liability. The Members shall look solely to the assets of the Company for any and all Distributions. If the assets of the Company remaining after the payment or discharge, or the provision for payment or discharge, of the debts, obligations, and other liabilities of the Company are insufficient to make any Distributions, no Member shall have any recourse against the separate assets of any other Member (except as otherwise expressly provided herein).

Section 3.2 Allocations. Subject to the application of Sections 3.3, Profits and Losses for any Fiscal Year shall be allocated among the Members in such a manner that, as of the end of such Fiscal Year, the sum of (a) the Capital Account of each Member, (b) such Member's share of Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(g)), and (c) such Member's partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)) shall be equal to the respective net amounts, positive or negative, that would be distributed to such Member or for which such Member would be liable to the Company under the Act, determined as if the Company were to (x) liquidate the assets of the Company for an amount equal to their aggregate Book Value (without making any adjustment thereto under clause (b) of the definition of "Book Value" for such liquidation) and (y) distribute the proceeds of such liquidation pursuant to Section 8.2.

Section 3.3 Special Allocations.

(a) Items of deduction and loss attributable to partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). If there is a net decrease during a Taxable Year in partner nonrecourse debt minimum gain (as defined in Treasury Regulations Section 1.704-2(i)(3)), items of income and gain for such Taxable Year (and, if necessary, for subsequent Taxable Years) shall be allocated to the Members in the amounts and of such character as determined according to Treasury Regulations Section 1.704-2(i)(4). This Section 3.3(a) is intended to be a minimum gain chargeback provision that complies with the requirements of Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted in a manner consistent therewith.

(b) Nonrecourse deductions (as determined according to Treasury Regulations Section 1.704-2(b)(1)) for any Taxable Year shall be allocated to each Member ratably among such Members based upon their respective Membership Interest. If there is a net decrease in the

Minimum Gain during any Taxable Year, each Member shall be allocated items of income and gain for such Taxable Year (and, if necessary, for subsequent Taxable Years) in the amounts and of such character as determined according to Treasury Regulations Section 1.704-2(f). This Section 3.3(b) is intended to be a minimum gain chargeback provision that complies with the requirements of Treasury Regulations Section 1.704-2(f), and shall be interpreted in a manner consistent therewith.

(c) If any Member that unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) has an Adjusted Capital Account Deficit as of the end of any Taxable Year, computed after the application of Sections 3.3(a) and 3.3(b) but before the application of any other provision of this Article III, then items of income and gain for such Taxable Year shall be allocated to such Member in proportion to, and to the extent of, such Adjusted Capital Account Deficit. This Section 3.3(c) is intended to be a qualified income offset provision as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(d) Losses shall not be allocated to a Member if such allocation of Losses would cause the Member to have an Adjusted Capital Account Deficit. Losses that cannot be allocated to a Member shall be allocated to the other Members; provided, however, that, if no Member may be allocated Losses due to the limitations of this Section 3.3(d), Losses shall be allocated to all Members in accordance with their respective Membership Interest.

(e) If, and to the extent that, any Member is deemed to recognize any item of income, gain, loss, deduction or credit as a result of any transaction between such Member and the Company pursuant to Code Section 83, 482, 483, 1272-1274 or 7872 or any similar provision now or hereafter in effect, and the Managers determines that any corresponding Profit or Loss of the Company should be allocated to the Members who recognized such item in order to reflect the Members' economic interests in the Company, then the Company may so allocate such Profit or Loss.

(f) The Managers may, with the consent of a Majority Interest, request a waiver from the Internal Revenue Service of the minimum gain chargeback and member nonrecourse debt minimum gain chargeback rules, pursuant to Treasury Regulations Sections 1.704-2(f)(4) and 1.704-2(i)(4), respectively. If such request is granted, this Agreement shall be applied in such instance as if it did not contain such minimum gain chargeback requirement.

Section 3.4 <u>Tax Allocations</u>.

(a) Except as provided in Sections 3.4(b), (c) and (d), the income, gains, losses, deductions and credits of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and credits among the Members for computing their Capital Accounts; except that, if any such allocation is not permitted by the Code or other applicable law, the Company's subsequent income, gains, losses, deductions and credits will be allocated among the Members so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value. In making allocations pursuant to this Section 3.4(b), the Managers shall apply, in its sole discretion, any method that may be permitted under Treasury Regulations Section 1.704-3.

(c) If the Book Value of any Company asset is adjusted pursuant to the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d) Allocations of tax credits, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Managers taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

(e) Allocations pursuant to this Section 3.4 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, Distributions or other Company items pursuant to any provision of this Agreement.

## ARTICLE IV

## CERTAIN TRANSACTIONS

Section 4.1 Transactions with Interested Persons. Unless otherwise provided herein or entered into in bad faith, no contract or transaction between the Company and one or more of the Managers or the Members, or between the Company and any other corporation, partnership, association or other organization in which one or more of the Managers or the Members have a financial interest or are directors, partners, members or officers, shall be voidable solely for such reason or solely because a Manager or Member was present or participated in the authorization of such contract or transaction; provided, that the material facts as to the relationship or interest of the Manager or Member and as to the contract or transaction were disclosed or known to the Managers, or, if a Manager is the interested person, any disinterested Members, and the contract or transaction was fair to the Company, and the Member interested in such contract or transaction or a Manager, as the case may be, shall not be considered to be in breach of this Agreement or liable to the Company, any Member, or any other Person for any loss or expense incurred by reason of such contract or transaction or shall be accountable for any gain or profit realized from such contract or transaction.

## ARTICLE V

## MANAGEMENT

Section 5.1 Management Authority. Except as otherwise expressly provided in this Agreement, the authority o(a) the Manager shall conduct, direct, and exercise full control over all activities of the Company, (b) all management powers over the business and affairs of the Company shall be exclusively vested in the Manager, (c) the Manager shall have the sole power to

bind or take any action on behalf of the Company, or to exercise any rights and powers (including, without limitation, the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to the Company under this Agreement or any other agreement, instrument, or other document to which the Company is a party, and (d) the Manager shall have the sole power on behalf of and in the name of the Company to carry out any and all of the objects and purposes of the Company, and to perform all acts and enter into and perform all agreements and other necessary undertakings that, in its sole discretion, it deems necessary or advisable or incident thereto.

Section 5.2 Delegation of Authority. The Manager may, from time to time, (a) appoint one or more Persons to be officers of the Company and may assign such titles and functions, and delegate such authority and duties, to such officers as it shall deem necessary or desirable, (b) appoint, employ or otherwise contract with such other Persons for the transaction of the business of the Company or the performance of services for or on behalf of the Company as it shall determine in its sole discretion, and (c) delegate to any Person (including any Member or officer of the Company) such authority and powers to act on behalf of the Company as it shall deem advisable in its sole discretion. Any appointment, employment, or other delegation pursuant to this Section 5.2 may be revoked at any time and for any or no reason by the Managers in their sole discretion.

Section 5.3 Composition; Actions; Meetings.

(a) The Company shall initially have one (1) Manager (also referred to herein as the "Managers"). Initially, the sole Manager shall be Larry Sant. The number of Managers may only be changed upon the affirmative vote of a Majority Interest; provided, however, in no instance shall there be less than one (1) Manager. A Manager shall hold office until his or her earlier death, Disability, resignation or removal as provided for in this Agreement. In the event there is more than one (1) elected or appointed Manager of the Company, any action which this Agreement authorizes the "Manager" or "Managers" to authorize or take shall be approved by a majority vote of the Managers then in office. During the times when there is only one (1) Manager of the Company, any reference to "Managers" herein shall be deemed to refer to the sole Manager and the action of the sole Manager shall be deemed the approval of the Managers for such action. A Manager may be removed or replaced at any time upon the affirmative vote of a Majority Interest. If a Manager is removed, resigns or suffers from a death or Disability, then the applicable Manager position may be filled by the affirmative vote of a Majority Interest or remain vacant, in which case the Company will continue with such reduced number of Managers.

(b) Any Manager may call a special meeting of the Managers. Notice of any meeting of the Managers shall be given at least 72 hours prior to any meeting of the Managers. Notice may be waived before or after a meeting or by attendance at such meeting without protest as to the adequacy of notice. Notice shall be given in the manner described in Section 10.12 and shall be deemed received as provided in Section 10.12. Managers may participate in a meeting of the Managers by means of a telephone or other teleconferencing or videoconferencing equipment, and such participation shall constitute presence in person at such meeting. Any action required or permitted to be taken by the Managers at a meeting may be taken without a meeting with the written consent of those Managers who would be authorized to take such action at a meeting of the Managers. The Managers may adopt such other procedures governing meetings and the conduct of business as they shall deem appropriate.

Section 5.4 Liability; Indemnification of Members, Managers, Officers, and Others.

(a) Each Manager and officer shall discharge his duties in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believes is in the best interests of the Company and its Members. In discharging his duties, a Manager or officer may rely on information, opinions, reports or statements, including, but not necessarily limited to, financial statements or other financial data, prepared or presented by (i) one or more Members or employees of the Company whom such Manager reasonably believes is reliable and competent with respect to the matter prepared or presented, or (ii) legal counsel, public accountants, engineers or other persons as to matters such Manager or officer reasonably believes are within such person's professional or expert competency; provided that such Manager or officer does not have knowledge concerning the matter in question that makes such reliance unwarranted. No Manager or officer will be personally liable to the Company or its Members for monetary damages for breach of any duty established under the Act, except that the foregoing will not eliminate or limit the personal liability of a Manager for the receipt of a financial benefit to which the Manager is not entitled, to the extent otherwise required under Section 308 of the Act, and/or a knowing violation of law.

(b) The Company hereby agrees to indemnify and hold harmless any Person (each an "Indemnified Person") to the fullest extent permitted under the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Company is providing immediately prior to such amendment), against all expenses, liabilities and losses (including attorney fees, judgments, fines, excise taxes or penalties) reasonably incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was a Member or is or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a manager, officer, director, principal, member, employee or agent of another partnership, corporation, joint venture, limited liability company, trust or other enterprise; provided, that no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to such Indemnified Person's or its Affiliates' gross negligence, willful misconduct or knowing violation of law. Expenses, including attorney fees, incurred by any such Indemnified Person in defending a proceeding shall be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company.

(c) The right to indemnification and the advancement of expenses conferred in this Section 5.4 shall not be exclusive of any other right that any Person may have or hereafter acquire under any statute, agreement, action of the Managers or otherwise.

(d) The Company may maintain insurance, at its expense, to protect any Indemnified Person against any expense, liability or loss described in paragraph (a) above whether or not the Company would have the power to indemnify such Indemnified Person against such expense, liability or loss under the provisions of this Section 5.4.

(e) Notwithstanding anything contained in this Agreement to the contrary (including in this Section 5.4), any indemnity by the Company relating to the matters covered in this Section 5.4 shall be provided out of and to the extent of Company assets only and no Member (unless such Member otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company.

(f) If this Section 5.4 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this Section 5.4 to the fullest extent permitted by any applicable portion of this Section 5.4 that shall not have been invalidated and to the fullest extent permitted by applicable law.

Section 5.5 Compensation and Reimbursement. No Manager shall be entitled to any compensation for managing the affairs of the Company in such capacity. Notwithstanding, the Company shall reimburse each Manager for all reasonable costs and expenses incurred by it on behalf of the Company. Such costs and expenses may include, but shall not necessarily be limited to, legal and accounting fees relating to the organization of the Company, current and recurring legal and accounting expenses and all costs of negotiating financing relating to the Company's business.

Section 5.6 Officers and Agents. The Manager, on behalf of the Company, may employ, retain or otherwise appoint persons as may be necessary or appropriate for the conduct of the Company's business, including employees and agents who may be designated as officers with titles, including, but not limited to, "chairman," "chief executive officer," "president," "vice president," "assistant vice president," "treasurer," "assistant treasurer," "secretary," "assistant secretary" and "chief financial officer," as and to the extent authorized by the Manager and with such powers as authorized by the Manager; provided, if powers are not enumerated herein or otherwise, such officers shall have rights, duties and obligations as person holding such position would have in a similarly situated entity engaged in the same business as the Company Business, in addition to such rights, duties and obligations as the Manager may prescribe. Initially, the officers of the Company shall be:

(a) Chief Executive Officer/CEO: David Sikkema

(b) Chief Marketing Officer/CMO: David Sikkema

(c) Chief Growing Officer/CGO: Vasja Treska

(d) Chief Financial Officer/CFO: Paul Graves

## ARTICLE VI

## MEMBERS

Section 6.1 Limitation of Liability. Except as otherwise provided by applicable laws, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or

Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or acting as a Manager of the Company; provided, that a Member shall be required to return to the Company any Distribution made to it in error. Notwithstanding anything contained in this Agreement to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

Section 6.2 Lack of Authority of Individual Members.

(a) Unless delegated such power in accordance with Section 5.2 and except as provided by paragraph (b) below, no Member shall in its capacity as such have the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company, or to make any expenditures on behalf of the Company, and the Members hereby consent to the exercise by the Managers of the powers and rights conferred upon them by law and this Agreement.

(b) Notwithstanding the foregoing paragraph (a) or Section 5.1, pursuant to Section 502(4) of the Act, the Company may not take any of the following actions without the affirmative vote of both the Managers and the Members pursuant to Section 6.5:

(i) a Sale of the Company;

(ii) enter into any merger under Sections 701 through 706 of the Act;

(iii) dissolve the Company under Section 801(c) of the Act;

(iv) amend the Articles; or

(v) convert the Company under Section 708 of the Act.

Section 6.3 No Right of Partition. No current or former Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

Section 6.4 Indemnification and Reimbursement for Payments on Behalf of a Member. If the Company is obligated to pay any amount to a governmental body (or otherwise makes a payment) because of a Member's status or that is otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign members, state personal property taxes, state unincorporated business taxes, etc.), then such Member shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments). The Managers may offset Distributions to which a Member is otherwise entitled under this Agreement against such Person's obligation to indemnify the Company under this section and otherwise treat such amount as a Tax Distribution made to such Member.

Section 6.5 Voting Rights. All matters that are required pursuant to this Agreement or the Act or other applicable law to be voted on by the Company's Members shall

require the approval of a Majority Interest. Any Member may delegate all or any of his voting rights or powers to another Member (but only in writing), in which case any act of the other Member shall be the act of the delegating Member.

Section 6.6 Other Business Interest; No Prohibition on Competition. The Manager(s) and each Member shall have the right to engage in any other business and to compete with the business of the Company, and neither the Company nor the Manager or any other Member shall have any rights or claims on account of such activities.

Section 6.7 Confidentiality. Each Member hereby acknowledges and agrees that it shall treat all Confidential Information (as defined below) in a confidential manner, not use any Confidential Information for its own or a third party's benefit and not communicate or disclose, orally or in writing, any Confidential Information to any person, either directly or indirectly, under any circumstances without the prior written consent of the Company. Each Member further agrees that it will promptly return or caused to be returned (or destroy or cause to be destroyed if it cannot be returned) to the Company all written or other tangible evidence of any Confidential Information and any memoranda with respect to Confidential Information which are in its possession or under its control upon the Company's request for the return of such items. Notwithstanding this Section 6.7, a Member may disclose Confidential Information if required (and then only to the extent required) by applicable law; provided, however, that prior to any such disclosure, such Member must provide the Company with written notice of such pending disclosure, sufficiently in advance so as to allow the Company a reasonable opportunity to contest such required disclosure. For purposes of this Agreement, the term "Confidential Information" means any "Trade Secret" as used in the Uniform Trade Secrets Act, as adopted in Michigan, and all other proprietary information related to the Company or any subsidiary, including any information which the Company or any subsidiary considers confidential and proprietary or which such Member reasonably believes that the Company or any subsidiary considers confidential and proprietary, including, without limitation: (i) business, financial, marketing and operational plans; (ii) forecasts and projections; (iii) sales plans and data; (iv) information which relates to the Company's or any subsidiary's proprietary products, prototypes, or plans; (v) client and vendor and potential client and vendor lists and information; and (vi) other information whether or not identified as confidential of a confidential and non-public nature. Notwithstanding the foregoing, information shall not be deemed to be Confidential Information if it is generally known and publicly available, without the fault of the Member and without the violation by any person of a duty of confidentiality or any other similar duty.

Section 6.8 Preemptive Rights.

(a) If the Company proposes to issue any additional Membership Interest or other equity interests or any securities containing options or rights to acquire any Membership Interest or other equity interests, in each case after the date of this Agreement (the "Proposed Equity Interests"), then the Company shall first offer to sell to each Member the number of such securities that is equal to the product of the total number of such Proposed Equity Interests multiplied by such Member's Membership Interest. The Company shall give each such Member at least fifteen (15) days prior written notice of any proposed issuance, which notice shall disclose in reasonable detail the proposed terms (including price per Proposed Equity Interest) and conditions of such issuance (the "Issuance Notice"). Each such Member will be entitled to

purchase its share of Proposed Equity Interests as determined above at the same price, on the same terms (including, if more than one type of Proposed Equity Interests is proposed to be issued, the same proportionate mix of such Proposed Equity Interests), and at the same time as the Proposed Equity Interests are issued, by delivery of a written notice to the Company of such election within fifteen (15) days after delivery of the Issuance Notice (the "Election Notice"). If any such Member has elected to purchase any Proposed Equity Interests, the sale of such Proposed Equity Interests shall be consummated as soon as practical (but in any event within fifteen (15) days) after the delivery of the Election Notice. Notwithstanding the foregoing, this Section 6.8(a) shall not apply to any Excluded Securities (as defined in Section 6.8(c) below).

(b) The Company shall have one hundred twenty (120) days after the 15-day election period described in subsection (a) above to sell all such Proposed Equity Interests for which the Members' preemptive rights hereunder were not exercised, at a price and upon terms no more favorable in any material respect to the purchasers thereof than specified in the Company's Issuance Notice. In the event the Company has not sold all such equity interests within such 120-day period, the Company shall not thereafter issue or sell any equity interests without (again) first notifying the Members and following the procedures set forth in subsection (a) above.

(c) For purposes of this Agreement, "Excluded Securities" shall mean: (i) Membership Interest issued or deemed issued pursuant to the acquisition of another entity by the Company by consolidation, merger, purchase of all or substantially all of the assets, or other reorganization in which the Company acquires, in a single transaction or series of related transactions, all or substantially all of the assets of such other entity or fifty percent (50%) or more of the voting power of such other entity or fifty percent (50%) or more of the equity ownership of such other entity, as approved by the Managers; and/or (ii) Membership Interest issued to a Service Provider Member. For purposes of this subparagraph (c), "Membership Interest" shall include options, other equity interests or securities convertible into Membership Interest or other equity interests of the Company.

Section 6.9 Drag Along Rights.

(a) In the event that a Sale of the Company is approved pursuant to this Agreement, then the Managers shall give written notice (the "Company Sale Notice") of such Sale of the Company to all the Members no later than fifteen (15) days prior to the consummation of the Sale of the Company that is the subject of such notice. The Company Sale Notice shall contain, if available, a copy of any definitive documentation pursuant to which Membership Interest or assets are to be sold, exchanged or otherwise transferred to the acquirer (the "Sale Documentation") and will state the name and address of such acquirer and the anticipated closing date of such Sale of the Company. Upon delivery of such notice, each Member shall be obligated to sell and, if applicable, deliver its respective Membership Interest on the terms and conditions applicable to the Sale of the Company.

(b) In connection with such Sale of the Company, each Member shall vote for, consent to and raise no objections against such Sale of the Company, whether structured as a sale of Membership Interest, assets or otherwise, and shall become a party to the Sale Documentation. If such Sale of the Company is structured as a (i) merger or consolidation, each Member shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger or

consolidation, if any, (ii) sale of Membership Interest, each Member shall agree to sell all of his, her or its Membership Interest on the terms and conditions approved pursuant to this Agreement and waive all minority shareholders' (members') statutory rights of dissolution, if any, or (iii) as a sale of assets, each Member shall vote in favor of such sale and any subsequent liquidation of the Company or other distribution of the proceeds resulting from such transaction; provided, that each Member shall receive the same form of consideration, and the same portion of the aggregate consideration, that such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in this Agreement.

(c) Each Member shall pay such Member's respective pro rata share (based on such allocation of consideration) of the expenses incurred by the Members in connection with such Sale of the Company, which may be deducted from the consideration such Member is entitled to receive in connection with such Sale of the Company, and each Member shall be obligated to join, based on such Member's respective pro rata share, in any indemnification or other obligations that are provided in connection with such Sale of the Company (other than any such obligations that relate specifically to a particular Member such as indemnification with respect to representations and warranties given by a Member regarding such Member's title to and ownership of Membership Interest ); provided, that no Member shall be obligated in connection with such Sale of the Company to agree to indemnify or hold harmless the transferees with respect to an amount in excess of the net cash proceeds paid to such Member in connection with such Sale of the Company.

(d) In the event a Member breaches its obligations under this Section 6.9 and fails to execute and/or deliver any requisite Sale Documentation, such breaching Member hereby irrevocably appoints each Manager (or such other person as may be designated by the Managers) as its attorney in fact with full power to execute and deliver any such Sale Documentation.

## ARTICLE VII
## TRANSFERS OF MEMBERSHIP INTEREST

Section 7.1 Transfers by Members.

(a) Subject to Sections 7.1(b) and (c) below, no Member may directly or indirectly (including by means of a change of ownership or change of control of such Member or any Person directly or indirectly controlling such Member) sell, assign, transfer, exchange, mortgage, pledge, grant a security interest in, or otherwise dispose of or encumber (whether voluntarily or involuntarily and including by operation of law) all or any of such Member's Membership Interest (each such event, a "Transfer") unless: (i) such Transfer has been approved by the Managers, and (ii) the transferee in any such Transfer is approved as a permitted Member in accordance with Marijuana Law. In the event that a transferee of a Transfer is not permitted as a Member in accordance with Marijuana Law, the Membership Interest proposed to be transferred shall remain with the transferor of such Membership Interest. In the event of an involuntary Transfer by a Member, immediately prior to the effective date of such Transfer, the transferring Member ("Transferring Member") shall grant an irrevocable proxy (coupled with an interest) to the Managers (or such other person as may be designated by the Managers) so that the voting rights associated with such Membership Interest are separated from the economic rights. Notwithstanding the Managers' consent to an assignment, and approval of such assignment as

required by Marijuana Law, pursuant to this Section 7.1(a), an approved assignee shall not become a substitute Member unless he, she or it satisfies the conditions set forth in Section 7.2 below. If any such transferee does not become a substitute Member then he, she or it shall have no rights except to receive any allocations and distributions which (but for the Transfer) would have been made to its transferor.

(b) Notwithstanding anything in Section 7.1(a) above to the contrary, on the death of an individual Member the Membership Interest held by such Member may be Transferred to its estate (or any persons who receive, or are to receive, the Membership Interest from such estate) or the persons designated in such Member's Estate Planning Entity (as the case may be), without the consent of the Managers, so long as (i) each such transferee executes and delivers to the Managers an agreement in form and substance satisfactory to the Managers to be bound by the terms herein in the same manner and to the same extent as the deceased Member, and assuming the obligations of the deceased Member hereunder with respect to the Membership Interest so transferred, and (ii) such transferee is approved as a permitted Member in accordance with Marijuana Law. Notwithstanding satisfaction of the conditions set forth in (i) and (ii) above, no transferee shall be deemed admitted to the Company as a substitute Member in place of the deceased Member unless he, she or it satisfies the conditions set forth in Section 7.2 below. If any such transferee does not become a substitute Member then he, she or it shall have no rights except to receive any allocations and distributions which (but for the Transfer) would have been made to its transferor. In the event that any approval required by Marijuana Law is not obtained (or the condition set forth in subsection (i) above is not satisfied), the Membership Interest held by the deceased Member shall be purchased and sold in accordance with Section 7.5 below.

(c) The restrictions set forth in Section 7.1(a) above shall not apply with respect to any Transfer by a Member who is an individual, to (i) such Member's siblings or spouse, provided that they are also a Member at such time (a "Permitted Family Member") or (ii) to any Estate Planning Entity of such Member (collectively referred to herein as a "Permitted Transferee"); provided, that the restrictions contained in this Article VII shall continue to be applicable to the transferred Membership Interest after any such Transfer; and provided, further, that the Permitted Transferees of such Membership Interest shall have: (A) executed and delivered to the Managers an agreement in form and substance satisfactory to the Managers to be bound by the terms herein in the same manner and to the same extent as the Transferring Member, and assuming the obligations of the Transferring Member hereunder with respect to the Membership Interest so transferred, and (B) been approved as a permitted Member in accordance with Marijuana Law. In the event that a Permitted Transferee is not permitted as a Member in accordance with Marijuana Law (or otherwise fails to satisfy the condition set forth in subsection (A) above), the Membership Interest proposed to be transferred shall remain with the transferor. Notwithstanding the foregoing, no party shall avoid the provisions of this Agreement by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee. Notwithstanding the foregoing, a Permitted Transferee shall not become a full substitute Member unless he, she or it satisfies the conditions set forth in Section 7.2 below.

Section 7.2 Substituted Member. An assignee of Membership Interest shall be admitted as a substitute Member in place of the Transferring Member to the extent of the Membership Interest assigned, only on satisfaction of each of the following conditions precedent:

(a) The Managers consent to such admission; provided, however, that the consent of the Managers is not required with respect to an assignment of Membership Interest to a Permitted Transferee;

(b) The assignee shall be responsible for any obligations under this Agreement; provided, however, that the assigning Member of a Permitted Transferee shall remain responsible for all obligations under this Agreement of such Permitted Transferee;

(c) The agreement effecting the assignment is reasonably satisfactory, in form and substance, to the Managers and the Company's counsel, and the Transferring Member and the assignee have executed and acknowledged such agreement and such other documents, instruments and papers as the Managers and the Company's counsel reasonably deem necessary, proper, convenient or desirable in order to evidence or effect the assignment or the admission of the assignee as a substitute Member in place of the Transferring Member to the extent of the Membership Interest assigned;

(d) The assignee accepts, adopts and agrees to be bound by all of the terms and provisions of this Agreement, as it may have been amended, from and after the effective date of the assignment, as if the assignee had joined in the original execution of this Agreement (and all subsequent amendments to it) as a Member. Such acceptance, adoption and agreement shall be set forth in a writing, the form and substance of which shall be satisfactory to the Managers and the Company's counsel; and

(e) Unless otherwise waived by the Managers, the assignee has paid, or acknowledged that he, she or it is obligated to pay, all reasonable fees and expenses (including, without limitation, all reasonable attorneys' fees and expenses) incurred by the Company in connection with such admission.

Section 7.3 Void Assignment. Any Transfer by a Member in contravention of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party. In the event of any Transfer in contravention of this Agreement, the purported transferee shall have no right to any profits, losses or Distributions of the Company or any other rights of a Member.

Section 7.4 Buy-Sell Provisions for Service Provider Members.

(a) Upon the Termination of Service of any Service Provider Member, unless otherwise specified in a written agreement signed by the Company or any of its subsidiaries or other employing Affiliate and such Service Provider Member, the Company may elect to purchase all or a portion of the Service Provider Membership Interest held by such Service Provider Member and any Permitted Transferee or other Affiliate thereof at a purchase price equal to the Repurchase Value of the Service Provider Membership Interest, by delivering a written notice of such election to such Service Provider Member within ninety (90) days after the Termination of Service.

(b) The closing of any purchase of Service Provider Membership Interest pursuant to this Section 7.4 shall occur on a date mutually agreeable to the parties thereto but in no event later than one hundred twenty (120) days after the applicable Termination of Service. Subject to the terms of any loan agreement to which the Company or its subsidiaries may be

subject, the purchase price shall be payable in cash or, at the Company's election, in cash and the Company's unsecured subordinated five-year promissory note payable in equal annual installments, bearing interest at a fixed rate equal to the "prime rate" as published in The Wall Street Journal on the date of Termination of Service; provided, however, if the Company pays a portion of such purchase price pursuant to its promissory note, the Company shall pay a portion of the purchase price in cash at the closing in an amount at least equal to one-fifth of the total purchase price for such Service Provider Membership Interest; provided, further, that in the event of a sale of all or substantially all of the Company's assets or initial public offering of the equity securities of the Company, any such promissory note shall become immediately due and payable in full. In the event that the terms of any loan agreement prohibit the Company from making any of the foregoing payments, such payment shall become payable on the earliest date on which the Company is no longer subject to such prohibition. The Company may assign its repurchase rights under this Section 7.4 to any other Member or Members.

Section 7.5 Buy/Sell Provisions for all Members.

(a) In the event that: (i) any Member is no longer eligible to be a Member of an entity licensed under Marijuana Law, or (ii) if following the death of any individual Member, such Member's estate (or any persons who receive, or are to receive, the Membership Interest from such estate) or the individual designated in such Member's Estate Planning Entity is not approved as a Member in accordance with Marijuana Law or otherwise fails to satisfy the conditions to such Transfer set forth in Section 7.1(b) above (each, a "Disqualified Member"), then the Company shall provide notice to the Members of such Member's status as a Disqualified Member (the "Disqualified Member Notice").

(b) Any Membership Interest of a Disqualified Member that have not been purchased and sold under this Section 7.5 shall be purchased by the Company for the Purchase Price.

(c) For purposes of this Section 7.5, "Purchase Price" means (i) in the event of a purchase triggered pursuant to Section 7.5(a)(i) above, one dollar ($1.00), and (ii) in the event of a purchase triggered pursuant to Section 7.5(a)(ii) above, the fair market value of a Disqualified Member's Membership Interest, as determined by the Company's accountants in their sole discretion, without applying any discounts for lack of marketability or control.

(d) The closing of any purchase and sale of Membership Interest pursuant to this Section 7.5 shall occur as soon as practicable, but in any event, to the extent possible, prior to any date required by Marijuana Law or such date (if any Membership Interest are still held by the Disqualified Member) that would cause a loss or suspension of any license issued under Marijuana Law. Subject to the terms of any loan agreement to which the Company or any of its subsidiaries may be subject (if applicable), the Purchase Price shall be payable in cash or, at each purchasing party's election, in cash and an unsecured subordinated five-year promissory note payable in equal annual installments, bearing interest at a fixed rate equal to the "prime rate" as published in The Wall Street Journal on the date of closing. However, if the purchasing party pays a portion of such Purchase Price pursuant to a promissory note, such purchaser shall pay a portion of the Purchase Price in cash at the closing in an amount at least equal to one-fifth of the total Purchase Price; provided, that in the event of a sale of all or substantially all of the Company's assets or initial

public offering of the equity securities of the Company, any such promissory note shall become immediately due and payable in full. In the event that the terms of any loan agreement related to the Company prohibit a purchasing party from making any of the foregoing payments, such payment shall become payable on the earliest date on which such purchaser is no longer subject to such prohibition.

## ARTICLE VIII

## DISSOLUTION AND LIQUIDATION AND VALUATION

Section 8.1 Dissolution. The Company shall be dissolved, and its affairs shall be wound up and terminated, upon:

(a) the approval of the Members by a vote taken according to Section 6.5; or

(b) the entry of a decree of judicial dissolution of the Company under the Act.

Except as set forth above or as otherwise required by law, the Company is intended to have perpetual existence.

Section 8.2 Liquidation of Company Interests.

(a) Upon dissolution, the Company shall be liquidated in an orderly manner. The Managers shall act (or they may appoint one or more Members, officers, or other Persons to act) as the liquidators to wind up the affairs of the Company pursuant to this Agreement and terminate the Company. The costs of liquidation shall be borne by the Company. Prior to final distribution and termination, the liquidators shall continue to operate the Company and its assets with all of the power and authority of Managers. The steps to be accomplished by the liquidators are as follows:

(i) the liquidators shall pay, satisfy and discharge all debts, obligations, and other liabilities of the Company to its creditors (including, without limitation, all sales commissions or other expenses incurred in liquidation and loans from Members) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, establishing cash reserves to be held in escrow for contingent or unforeseen liabilities of the Company, in such amounts and for such holding periods as the liquidators may reasonably determine); and

(ii) after payment or provision for payment of all of the Company's liabilities has been made in accordance with subparagraph (i), all remaining assets of the Company shall be distributed to the Members in accordance with Section 3.1(b).

(b) The distribution of cash and/or property to a Member in accordance with the provisions of this Section 8.2 constitutes a complete return to such Member of its Capital Contributions and a complete distribution to the Member of its interest in the Company and the Company's property.

(c) Upon completion of the distribution of the Company's assets as provided in this Agreement, the Company shall be terminated (and the Company shall not be terminated prior

to such time), and the Managers (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Department, cancel any other filings made pursuant to this Agreement that are or should be canceled and take all such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 8.2(c).

(d) A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to this Section 8.2 in order to minimize any losses otherwise attendant upon such winding up.

(e) The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to any Member (it being understood that any such return shall be made solely from Company assets).

## ARTICLE IX

## BOOKS OF ACCOUNT

Section 9.1 Records and Accounting. The Company shall maintain complete and accurate books of account of the Company's affairs at the Company's principal office, which books shall be open to inspection by any Member (or such Member's authorized representative) at any time during ordinary business hours. The Company shall deliver to each Member copies of such financial statements as the Company may cause to be prepared, promptly after such statements have been completed and received by the Company.

Section 9.2 Bank Accounts. The Company may establish accounts for the deposit of Company funds, in such types and at such institutions, as shall be determined from time to time by the Manager(s). The Chief Financial Officer has the authority to establish such deposit accounts and take any actions with respect to such accounts, including, without limitation, opening accounts, closing accounts, depositing and withdrawing funds, writing checks and initiating wire transactions, without prior written consent of the Managers.

Section 9.3 Fiscal Year. The Fiscal Year of the Company shall be the calendar year, or such other annual accounting period as may be established by the Managers or as otherwise required under Code Section 706.

Section 9.4 Tax Elections.

(a) The Taxable Year of the Company shall be the same as the Company's Fiscal Year, unless the Managers shall determine otherwise in its sole discretion and in compliance with applicable laws.

(b) The shall in its sole discretion determine whether to make or revoke any available election pursuant to the Code. Each Member will upon request supply any information necessary to give proper effect to any such election.

Section 9.5 Tax Reports. The Company shall provide to each Member the Company's tax return and Form K-1 for each Taxable Year as will enable the Members to file their respective tax returns on a timely basis (including extensions), and such other information as may

be necessary for the preparation of each such Member's United States federal and state income tax returns or information returns.

Section 9.6 Tax Controversies.

(a) The Managers hereby appoint Paul Graves as the partnership representative as provided in Code Section 6223(a) (the "PR"). The PR can be removed at any time by the Managers. In the event of the resignation or removal of the PR, the Manager shall select a replacement. If the resignation or removal of the PR occurs prior to the effectiveness of the resignation or removal under applicable Treasury Regulations or other administrative guidance, the PR that has resigned or been removed shall not take any actions in its capacity as PR except as directed by the successor PR.

(b) The PR is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by taxing authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The PR shall promptly notify the Managers of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon the receipt of a notice of final partnership administrative adjustment or final partnership adjustment, and shall keep the Managers reasonably informed of the status of any tax audit or resulting administrative or judicial proceeding. Without the consent of the Managers, the PR shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any taxing authority. No Member or Equity Owner (defined below) shall have the right to participate in the audit of any Company tax return or any administrative or judicial proceedings conducted by the PR arising out of or in connection with any such audit.

(c) The PR, with the consent of the Managers, shall have the right to make on behalf of the Company any and all tax elections under the Bipartisan Budget Act of 2015, including the following: (i) to opt out under Code Section 6221(b), if available; (ii) to pay the Company level imputed underpayment under Code Section 6225; or (iii) to push out any underpayment to Members and former Members ("Former Members") under Code Section 6226. Each Member and Former Member shall take all such actions as requested by the PR, including without limitation, filing any amended tax returns, taking into account any adjustments and paying any taxes, interest and penalties arising from the PR's election under Code Section 6226.

(d) If the Managers directs the PR to cause the Company to pay the imputed underpayment under Code Section 6225 (including any interest and penalties), the PR shall use commercially reasonable efforts to reduce any taxes payable by the Company by taking into account modifications available under Code Sections 6225(c)(2), (3), (4), and (5). The Managers may seek reimbursement from the Members and Former Members who were owners with respect to such audited tax year (collectively, the "Equity Owners") for their equitable share of such imputed underpayment (including any interest and penalties) (the "Underpayment Share") and each such Equity Owner agrees to pay such Underpayment Share to the Company. Any such payments made by an Equity Owner shall not be treated as a capital contribution. The Company shall have a right of setoff against distributions otherwise owing to an Equity Owner in the amount

of his, her or its Underpayment Share. Any imputed underpayment paid by the Company on behalf of an Equity Owner and not reimbursed by that Equity Owner shall be treated as a distribution to such Equity Owner.

(e) The PR shall not have any liability to the Company or any Member for any acts or omissions in his, her or its capacity as the PR. The Company shall reimburse the PR for all costs and expenses reasonably incurred by him, her or it on behalf of the Company, other than as a result of the PR's fraud, willful misconduct or gross negligence. The Company shall indemnify, defend and hold harmless the PR from and against any and all claims, liabilities, costs and expenses (including reasonable attorney fees and court costs) incurred by him, her or it as a consequence as serving or acting as the PR, other than as a result of the PR's fraud, willful misconduct or gross negligence.

## ARTICLE X

## MISCELLANEOUS

Section 10.1 Further Action. The parties shall execute and deliver all documents, instruments, and certificates, provide all information, and take or refrain from taking all such further actions as may be necessary or appropriate to achieve the purposes of this Agreement and effect the provisions hereof, as determined in good faith by the Managers.

Section 10.2 Title to Company Assets. The Company's assets will be deemed to be owned by the Company as an entity, and no Member, individually or collectively, will have any ownership interest in any Company asset or any portion thereof.

Section 10.3 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates, and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Distributions, capital or property other than as a creditor.

Section 10.4 Amendments, Modifications, or Waivers. Any provision of this Agreement may be amended, modified or waived only upon the prior written approval of a Majority Interest; provided, however, that this Agreement may be amended by the Managers without the Members' approval to (a) correct any clerical or ministerial errors in this Agreement, (b) amend Schedule A hereto to reflect changes in ownership in accordance with this Agreement and (c) add the provisions described in Section 2.6.

Section 10.5 Successors and Assigns. Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the Members and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns, whether so expressed or not.

Section 10.6 Remedies. Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law. Any

Person having any rights under any provision of this Agreement or any other agreements contemplated by this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

Section 10.7 Governing Law. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Michigan, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Michigan or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Michigan.

Section 10.8 Compliance with Laws. At all times during the term of this Agreement, the Company shall obtain and maintain all permits, licenses and approvals as may be required by applicable law in order to engage in its activities as described in this Agreement, and shall otherwise operate in such a manner so as to comply with all laws that may be applicable to the Company or its affairs.

Section 10.9 Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

Section 10.10 Counterparts. This Agreement may be executed simultaneously in two or more separate counterparts, any one of which need not contain the signatures of more than one party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

Section 10.11 Descriptive Headings; Interpretation. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. The use of the words "or," "either" and "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 10.12 Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when (a) delivered personally to the recipient, (b) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m. Eastern time on a business day, and otherwise on the next business day, (c) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) sent by e-mail to the recipient. Such notices, demands and other communications shall be sent to the Members and to the Company at the addresses set forth on the attached Schedule A.

Section 10.13 Complete Agreement. This Agreement embodies the complete agreement and understanding among the parties and terminates, supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

Section 10.14 Business Days. If any time period for giving notice or taking action under this Agreement expires on a day which is a Saturday, Sunday, or legal holiday in the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday, or legal holiday.

Section 10.15 Electronic Delivery. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic transmission in "pdf" or comparable form, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or "pdf" to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or as a "pdf" as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 10.16 Acknowledgment re: Jaffe, Raitt, Heuer & Weiss, Professional Corporation. Each Member acknowledges that Jaffe, Raitt, Heuer & Weiss, Professional Corporation and its individual attorneys (collectively, "JRHW") have participated in the drafting of this Agreement for and on behalf of the Company. JRHW has not been retained to represent, and in fact is not representing, any individual Member or any other parties in connection with the preparation, negotiation, or evaluation of the matters contemplated by this Agreement. The Members acknowledge and agree that: (i) each has been advised to seek the advice of independent counsel and that they were given ample opportunity to seek advice from legal counsel of their choosing; and (ii) each has obtained the advice of independent counsel or decided not to accept or obtain such advice.

[*Signatures on the following pages*]

The parties hereto have caused this Agreement to be signed as of the date first above written.

**MEMBERS:**

______________________________
PAUL GRAVES

______________________________
BOXUN HU

______________________________
RAY OATMAN

______________________________
FERDI RAKAJ

______________________________
MATILDA RAKAJ

______________________________
LARRY SANT

______________________________
ANITA SIKKEMA

______________________________
DAVID SIKKEMA

______________________________
JAMES SIKKEMA

______________________________
JOHANNES SIKKEMA

______________________________
STEVEN SIKKEMA

______________________________
VASJA TRESKA

______________________________
FEI XIE

# SCHEDULE A

## Schedule of Members

| Member | Membership Interest |
|---|---|
| Paul Graves<br>53304 Hidden River Drive<br>South Lyon, MI 48178 | 8.00 % |
| Fei Xie<br>626 1st Ave., Apt. E11J<br>New York City, NY 10016 | 0.00 % |
| Boxun Hu<br>2840 Jackson Ave., Apt 19F<br>Long Island City, NY 11101 | 0.00 % |
| Anita Sikkema<br>9201 W 225 N<br>Etna Green, IN 46524 | 10.00 % |
| David Sikkema<br>3842 Haynes Street<br>Jordan Station, Ontario, Canada L0R 1SO | 8.00 % |
| James Sikkema<br>12 Canada Street<br>Hamilton, Ontario, Canada, L0S 1E6 | 8.00 % |
| Johannes Sikkema<br>585 La Brant Rd.<br>Kalispell, MT 59901 | 8.00 % |
| Steven Sikkema<br>2127 Hollow Road<br>Fonthill, Ontario, Canada, L0S 1E6 | 8.00 % |
| Matilda Rakaj<br>47465 Barbara Road<br>Macomb, MI 48044 | 9.40 % |
| Ferdi Rakaj<br>2500 Normandy Road, Unit 43<br>Royal Oak, MI 48073 | 9.30 % |
| Vasja Treska<br>33707 Bayview Drive<br>Chesterfield Township, MI 48045 | 6.30 % |
| Ray Oatman<br>8226 Acker Highway<br>Hudson, MI 49247 | 12..50 % |
| Larry Sant<br>7754 Hidden Ridge Ln.<br>Northville, MI 48148 | 12.50 % |
| **TOTALS:** | **100.00 %** |